HAKALA v BURROUGHS CORPORATION (ON REHEARING)

Docket No. 55246. Submitted September 13, 1974 (Calendar No. 16).—
Decided December 19, 1974, 393 Mich 153. Rehearing granted
395 Mich 922. Submitted on rehearing January 27, 1976 (Calendar No. 14).—Decided December 30, 1976.

Edward J. Hakala claimed workmen's compensation benefits for
total and permanent disability against Burroughs Corporation
and the Second Injury Fund, based on the loss of his right hand
and of some of the fingers on his left hand in his employment
at Burroughs when he had a prior impairment of the vision in
his left eye. The Workmen's Compensation Appeal Board de-
nied benefits because the plaintiff retained more than 20% of
normal vision in his left eye with the use of corrective glasses.
The Court of Appeals, V. J. Brennan, P. J., and Danhof and
Bashara, JJ., affirmed on the ground that the plaintiff's loss of
vision was not caused by an injury (Docket No. 13842). Plaintiff
appeals. *Held:*

The Supreme Court unanimously voted to reverse the deci-
sion of the Court of Appeals and to hold that an injured
worker's prior loss need not be due to an injury in order to
qualify for permanent and total disability benefits from the
Second Injury Fund. The legislative purpose behind the Second
Injury Fund was to enhance the prospects for employment of
certain handicapped persons who had previously sustained
specific losses by relieving an employer of liability for payment
of workmen's compensation for an injury in an amount greater
than that for an injury to a person not so handicapped.

Justice Levin, with Chief Justice Kavanagh and Justices
Fitzgerald, Lindemer, and Ryan concurring, held that until the
Legislature speaks with greater clarity the courts should decide
second injury cases guided primarily by the legislative purpose
to help the handicapped obtain and maintain employment.
Neither uncorrected nor corrected vision is necessarily the
standard by which loss of an eye is to be measured in all cases.

REFERENCES FOR POINTS IN HEADNOTES
[1–10] 82 Am Jur 2d, Workmen's Compensation §§ 343, 344, 346.
Workmen's Compensation: compensation for loss or impairment of
eyesight. 142 ALR 822

The conclusion that an uncorrected vision standard should be employed for determining entitlement to specific loss benefits where a worker suffers a work-related injury to his eye does not compel use of an uncorrected vision test in all cases. The ultimate question is whether the "first loss" (which need not be work-related and need not be the result of an injury), in this case the loss of vision, was a permanent disability within the legislative purpose in the Second Injury Fund of aiding the handicapped in obtaining and maintaining employment. The Workmen's Compensation Appeal Board erred in deciding this claim on the basis of whether the plaintiff's vision could be corrected rather than whether he was permanently disabled in the form of the loss of an eye.

Remanded to the Workmen's Compensation Appeal Board for determination of whether the plaintiff's loss of vision rendered him permanently disabled for purposes of the Second Injury Fund Act.

Justice Coleman, dissenting in part, would affirm the decision of the Workmen's Compensation Appeal Board as to the test of loss of vision to be used on the ground that the use of glasses by both the young and the old is a very ordinary occurrence. Vision in excess of 20% of normal, when corrected by the use of eyeglasses, does not meet the statutory test of industrial loss of vision. The original purpose of the Second Injury Fund was to encourage the hiring of handicapped persons. To interpret the act to allow a person who "always had" poor uncorrected vision to be treated as a person with a "first injury", although the corrected vision is within normal range, would create a new class of handicapped persons, the foreseeable result of which would militate against hiring people wearing eye glasses or contact lenses.

Justice Williams, dissenting in part in a memorandum opinion, voted to apply the test found in case law, and require that the plaintiff's eye be tested without the benefit of any artificial device to determine whether he had an 80% loss of vision under the terms of the statute. Under the facts of this case the plaintiff would, therefore, be eligible for benefits from the Second Injury Fund.

48 Mich App 639; 211 NW2d 60 (1973) reversed.

OPINION OF THE COURT

1. WORKMEN'S COMPENSATION—PERMANENT AND TOTAL DISABILITY—
   SECOND INJURY FUND—STATUTES.

An injured worker's prior loss need not have been due to an

injury in order for him to qualify for permanent and total disability benefits from the Second Injury Fund.

2. WORKMEN'S COMPENSATION—SECOND INJURY FUND—LEGISLATIVE PURPOSE.

   The legislative purpose behind the creation of the Second Injury Fund was to enhance the prospects for employment of certain handicapped persons who had previously sustained specific losses by relieving an employer of liability for payment of workmen's compensation for an injury in an amount greater than that for an injury to a person not so handicapped.

3. WORKMEN'S COMPENSATION—PERMANENT DISABILITY—LOSS OF EYE —VISION STANDARD.

   The rule that an uncorrected vision standard should be employed for purposes of determining entitlement to specific loss benefits under the Workmen's Compensation Act where a worker suffers a work-related injury to his eye does not compel use of an uncorrected vision test in all cases; the statute does not indicate whether a corrected or uncorrected test should be applied, and the decision in second injury cases should be guided primarily by the legislative purpose in creating the Second Injury Fund, to help the handicapped obtain and maintain employment (MCL 412.8a, 412.10; MSA 17.158[1], 17.160).

4. WORKMEN'S COMPENSATION—LOSS OF VISION—PERMANENT DISABILITY—SECOND INJURY FUND.

   It may be said that all persons with an 80% loss of vision, regardless of whether it can be corrected, have a permanent disability but that is not the sense in which the Legislature used that phrase in defining a permanent disability in the section of the Workmen's Compensation Act concerning the Second Injury Fund (MCL 412.8a; MSA 17.158[1]).

5. WORKMEN'S COMPENSATION—SECOND INJURY FUND—FIRST LOSS— CONSTRUCTION OF STATUTES.

   The Legislature has provided a general definition of "first loss" (which need not be work-related) for Second Injury Fund purposes and left to the courts the task of applying it; the ultimate question in deciding how to measure vision so as to determine whether there has been a "first loss" of permanent disability in the form of loss of an eye is whether the first loss was a permanent disability within the legislative purpose of aiding the handicapped in obtaining and maintaining employment; the Legislature did not intend that persons suffering nothing worse than near- or farsightedness should be considered perma-

nently disabled and therefore eligible for Second Injury Fund benefits should a "second" loss occur (MCL 412.8a; MSA 17.158[1]).

6. WORKMEN'S COMPENSATION—SECOND INJURY FUND—LOSS OF VISION —FIRST LOSS.

A workmen's compensation case should be remanded to the appeal board for determination whether claimant's loss of vision, which was 20/300 uncorrected and 20/50 minus one corrected, rendered him permanently disabled, in the sense that term is used for purposes of Second Injury Fund coverage, before he suffered a second loss where the appeal board erred in deciding the claim on the basis of whether claimant's vision could be corrected, rather than whether he was permanently disabled in the form of loss of an eye (MCL 412.8a; MSA 17.158[1]).

SEPARATE OPINION

COLEMAN, J.

See headnotes 1 and 2.

7. WORKMEN'S COMPENSATION—SECOND INJURY FUND.

*The original purpose of the Second Injury Fund was to encourage hiring of the handicapped.*

8. WORKMEN'S COMPENSATION—GLASSES—VISION LOSS.

*The use of glasses is a very ordinary occurrence both by the young and the old; vision in excess of 20% of normal, when corrected by the use of eyeglasses, does not meet the statutory test of industrial loss of vision.*

MEMORANDUM OPINION

WILLIAMS, J.

See headnotes 1 and 2.

9. WORKMEN'S COMPENSATION—VISION LOSS—UNCORRECTED VISION— SECOND INJURY FUND.

*The degree of vision loss is measured in terms of uncorrected vision when a claim is made for Second Injury Fund benefits based on a prior loss of 80% vision in one eye.*

10. WORKMEN'S COMPENSATION—VISION LOSS—SECOND INJURY FUND.

*A workmen's compensation claimant met the statutory definition for the loss of an eye and is eligible for Second Injury Fund benefits where in the course of his employment he suffered the*

*amputation of his right hand and portions of the first and second fingers of his left hand and before that injury had less than 20% uncorrected vision in his left eye.*

*Kelman, Loria, Downing, Schneider & Simpson* (by *Robert W. Howes*), for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *David J. Watts* and *A. C. Stoddard,* Assistants Attorney General, for defendant Second Injury Fund.

*Carl Mitseff,* for defendant Burroughs Corporation.

LEVIN, J. I concur in part I of the memorandum opinion but dissent as to part II.

In 1962, Edward Hakala suffered a compensable injury while working for Burroughs Corporation. He suffered the loss of his right hand and portions of the first and second fingers of his left hand. Burroughs Corporation voluntarily paid workmen's compensation benefits for these specific losses.

In 1968, Hakala filed for second injury benefits (§ 8a of part II of the act) claiming that when he suffered the compensable injury resulting in loss of a hand he had a "permanent disability in the form of the loss of a[n] * * * eye."[1]

At the time Hakala lost his right hand, the

---

[1] "If an employee has at the time of injury permanent disability in the form of the loss of a hand or arm or foot or leg or eye and at the time of such injury incurs further permanent disability in the form of the loss of a hand or arm or foot or leg or eye, he shall be deemed to be totally and permanently disabled and shall be paid, from the funds provided in this section, compensation for total and permanent disability after subtracting the amount of compensation received by the employee for both such losses. The payment of compensation under this section shall begin at the conclusion of the payments made for the second permanent disability". 1948 CL 412.8a; MSA 17.158(1) (now MCLA 418.521; MSA 17.237[521]).

vision in his left eye was 20/300 uncorrected, 20/50 minus one corrected.

The parties appear to agree that reference should be made to the specific loss provision, § 10(a) of part II (1965 PA 44, part 2, § 10) where the loss of an eye is defined "for the purpose of this act [as an] 80% loss of vision in 1 eye".

Hakala's vision loss uncorrected exceeds 80%; corrected, his vision loss is less than 80%.

Hakala contends that the proper test by which to determine whether he had suffered "permanent disability in the form of the loss of an eye" is the statutory test ("80% loss of vision") as interpreted by *Lindsay v Glennie Industries, Inc,* 379 Mich 573; 153 NW2d 642 (1967), and adopted by *Hilton v Oldsmobile Division of General Motors Corp,* 390 Mich 43; 210 NW2d 316 (1973)—*i.e.,* 80% loss of vision *uncorrected.*

In *Lindsay,* this Court said, in a case where the worker had suffered a work-related injury, that for purposes of determining entitlement to specific loss benefits under § 10(a) an uncorrected vision test would be utilized. In *Hilton,* we extended application of the uncorrected vision standard to Second Injury Fund benefits where the claimant's first loss was removal of the natural lens.[2]

Burroughs Corporation and the Second Injury Fund counter that *Hilton* and *Lindsay,* both involving removal of the natural lens, are unique cases and represent exceptions to the usual rule of

---

[2] This Court held that the claimant who, as the result of an injury arising out of and in the course of his employment, lost the industrial use of his left leg and who at the age of ten had undergone a bilateral cataract extraction, qualified for payments from the Second Injury Fund. Relying on *Lindsay* as authority as to specific loss, this Court determined that Hilton, who had the natural lenses removed from his eyes, qualified for Second Injury Fund benefits regardless of the fact that with contact lens and glasses, his corrected vision in both eyes was 20/25.

corrected vision as the standard for determining loss of an eye.[3]

## I

The question is whether Hakala's loss of vision, conceding that it fits within the *Lindsay* definition for determining specific loss of an eye *for purposes of § 10(a),* constituted "permanent *disability*" contemplated by the Legislature when it provided for Second Injury Fund benefits in § 8a.[4]

The legislative purpose in creating the Second

---

[3] The Workmen's Compensation Appeal Board found the ultimate question was whether a corrected or an uncorrected vision standard should be applied:

"If, as plaintiff contends, the Court in *Lindsay* has established the rule that the test of uncorrected vision is the proper test in such cases then he should prevail. If, on the other hand, *Lindsay* is not applicable to the facts of this case, then the Court's prior holdings in *Hirschkorn v Fiege Desk Co,* 184 Mich 239 [150 NW 851 (1915)] and *Cline v Studebaker Corp,* 189 Mich 514 [155 NW 519; 1916C LRA 1139 (1915)], wherein corrected vision loss was the test, controls in this case."

The board then distinguished *Lindsay* on the ground that in that case the natural lens of the eye was removed. Hakala, having suffered nothing more than a loss of vision which was corrected with glasses, was found not to have lost an eye so as to qualify as permanently disabled within the meaning of the Second Injury Fund provision.

[4] We appreciate that the Legislature has for purposes of § 10(b) of the act eschewed an "in fact" determination of total and permanent disability. The Legislature adopted specific definitions of total and permanent disability thereby limiting the scope of § 10(b) coverage. Thus, a person who is in fact totally and permanently disabled may not receive benefits under § 10(b) unless he can fit within one of the enumerated definitions; likewise, a person who fits within the literal reading of a specific definition may receive benefits even though he is not in fact disabled.

We note, without expressing either a favorable or unfavorable opinion, that the Court of Appeals is incorporating a disabled, unemployable concept into cases under § 10(b). *See Sprute v Herlihy Mid-Continent Co,* 32 Mich App 574; 189 NW2d 89 (1971), and *Legut v Detroit Window Cleaning Co,* 54 Mich App 404; 221 NW2d 232 (1974), leave to appeal granted. 393 Mich 767 (1974).

Hakala is not claiming under § 10(b). Hakala seeks benefits under § 8(a) as a person who had suffered a "permanent disability in the form of the loss of an eye."

Injury Fund was "to enhance the prospects for employment of certain handicapped persons who had previously sustained specific losses, so that they and their families would have a means of livelihood". *Verberg v Simplicity Pattern Co,* 357 Mich 636, 643; 99 NW2d 508 (1959).

Section 10(a), the specific loss provision, defining loss of an eye "for the purpose of this act [as an] 80% loss of vision", does not indicate whether a corrected or uncorrected vision test should be applied. The Legislature has here, as in other statutes, adopted an inartful standard and left to the courts the task of devising common-sense rules for its application in particular factual situations. Our conclusion in *Lindsay* that an uncorrected vision standard should be employed for purposes of determining entitlement to specific loss benefits where a worker suffers a work-related injury to his eye does not compel use of an uncorrected vision test in all cases. Until the Legislature speaks with greater clarity, the courts should decide second injury cases guided primarily by the legislative purpose in enacting the Second Injury Fund—to help the handicapped obtain and maintain employment.

We agree with Justice COLEMAN that the memorandum opinion portends results not in accord with "the original purpose of the Second Injury Fund, which was to encourage hiring of the handicapped", but we do not agree with her that corrected vision is the standard by which loss of an eye is to be measured in all workmen's compensation cases.

These cases, involving claims arising out of disparate factual situations and based on different sections of a frequently amended act, do not lend themselves to flat rules.

## II

The memorandum opinion rests on the *Lindsay* construction of § 10(a), which, as amended in 1943, defined the loss of an eye as an "80% loss of vision". It states that *"Lindsay* held that the plain meaning of this amended language required the eye to be tested without the benefit of any artificial device".

*Lindsay* concerned payment for specific loss of an eye as the result of an injury arising out of and in the course of claimant's employment. In that context, this Court held that "[t]he surgical removal of the natural lens made necessary by an injury arising out of and in the course of claimant's employment is loss of an eye within the meaning of the amended statute." 379 Mich 573, 578 (1967). So saying, however, gives no reason for applying this rule to a second-injury claim.

To merely state that the "plain meaning" of the § 10(a) statutory language, defining the loss of an eye as an "80% loss of vision", requires an uncorrected vision test for Second Injury Fund purposes ignores the act's silence on this point and eschews proper analysis.

Many cases which raise issues of statutory construction can be decided either way. To contend, without more, that the meaning of a statute is "plain" is to ignore that the parties have in good faith litigated the question to the highest court in this state, that other courts have reached contrary results on similar statutory language, that Justice COLEMAN has presented for consideration a contrary, yet maintainable, position and that the appeal board in this case applied a corrected loss of vision test and found that Hakala "has not met the definition of permanent and total disability

within the meaning of [the Second Injury Fund provision]."

Carl Llewellyn observed, only infrequently "a legislative intent with some concrete reality can be uncovered in circumstance or legislative history. For the rest, the court's work is not to *find,* any more than it is with case law. It is to *do,* responsibly, fittingly, intelligently, with and within the given frame." (Emphasis by author.) Llewellyn, *The Common Law Tradition, Deciding Appeals,* p 382.

The memorandum opinion suggests that all persons with an 80% loss of vision, regardless of whether it can be corrected, have a permanent disability entitling them to Second Injury Fund benefits if they suffer "second" injuries.

While we agree that in one sense it may be said that all persons with an 80% loss of vision, regardless of whether it can be corrected, have a "permanent disability", we do not agree that that is the sense in which the Legislature used that phrase in section 8a.

As noted by Justice COLEMAN, the uncorrected vision of at least two of the Justices on this Court and countless other citizens of this state is 20% or less *(i.e.,* at least 80% loss). In this connection it is relevant, as stated in part I of the memorandum opinion, that the first loss for Second Injury Fund purposes need not be work-related and need not be the result of an injury. See *Hilton, supra,* at 47. The Legislature has provided a general definition of the first loss for Second Injury Fund purposes ("permanent *disability* in the form of the loss of an eye") and left to the courts the task of applying it to claims arising out of various factual situations.

The ultimate question is whether the first loss was a permanent disability within the *legislative*

*purpose* of aiding the handicapped in obtaining and maintaining employment. We are considering not just the 80%-loss-of-vision provision in isolation, but in the context of eligibility for second injury benefits. Surely, the Legislature did not intend that persons suffering nothing worse than near- or farsightedness should be considered permanently disabled and therefore eligible for Second Injury Fund benefits should a "second" loss occur.

We are not sufficiently informed as to the true nature of Hakala's condition to allow us to decide this case.[5] The appeal board erred in deciding this claim on the basis of whether Hakala's vision could be corrected, not whether Hakala was "permanently disabled in the form of the loss of a[n] * * * eye".

We should remand to the appeal board for determination whether Hakala's loss of vision rendered him permanently disabled in the sense that term is used for purposes of Second Injury Fund coverage. In retrospect, it may have been better to have remanded *Hilton* to the appeal board for further consideration rather than to have decided that case as a matter of law.

We would remand to the appeal board for further proceedings.

KAVANAGH, C. J., and FITZGERALD, LINDEMER, and RYAN, JJ., concurred with LEVIN, J.

COLEMAN, J. *(concurring in part; dissenting in part).* Both as a matter of public policy and of law, I dissent as to part II of the memorandum opinion but concur in part I.

The memorandum opinion does violence to the

---

[5] *See* fn 1 of the memorandum opinion.

original purpose of the Second Injury Fund, which was to encourage hiring of the handicapped. Under its interpretation, a person who "always had" poor uncorrected vision in one eye comes to his employment with a "first injury," although the corrected vision is within normal range. The Court creates a new class of handicapped persons, the foreseeable result of which will militate against hiring people wearing eye glasses or contact lenses.

My dissent in *Hilton v Oldsmobile Division of General Motors Corp,* 390 Mich 43; 210 NW2d 316 (1973), anticipated this extension of that decision. *Hilton* was based upon *Lindsay v Glennie Industries, Inc,* 379 Mich 573; 153 NW2d 642 (1967), which was designated a case of first impression. This designation and treatment ignored the long line of cases which related loss of vision to loss of ability to carry out employment.[1] In short, corrected vision was the standard by which "loss of an eye" was measured. The *Lindsay* court took the course leading in the opposite direction from established law.

It is agreed that this case affords a logical extension of *Lindsay.* The result in this case demonstrates how illogical the *Lindsay* analysis is and reinforces my conclusion in *Hilton* that "we are headed on a course which is not in the best interest of either employers or employees and which has serious implications for all".

In its opinion reversing the referee's award, the Workmen's Compensation Appeal Board quoting from *Cline v Studebaker Corp,* 189 Mich 514; 155 NW 519; 1916C LRA 1139 (1915) said:

---

[1] See my analysis of the pre-*Lindsay* case law in *Hilton* which disclosed "the fact that in each case of partial loss of vision, the court analyzes the claim for the 'loss of an eye' upon the basis of the 'vision' or 'sight' remaining with the use of a lens and/or glasses".

"We agree with the opinion of the court in *Cline,*
*supra,* that 'the use of glasses is a very ordinary occur-
rence both by the young and the old.' Vision in excess
of twenty percent of normal, when corrected by the use
of eye glasses, does not meet the statutory test of
industrial loss of vision."

I also agree.

It could be argued that employers might actu-
ally seek to hire a person with poor but correcta-
ble eyesight, thus insuring that he or she would
pass directly to the Second Injury Fund upon the
employee's first work-related "loss". The corrected
eyesight would not affect the ability to work and
one of the injuries specified in MCLA 418.521;
MSA 17.237(521) would relieve the employer of his
obligation to pay full benefits. "Good for both", it
may be argued.

However, this approach ignores basic economics
and is likely to lead to a heady if short-term
illusion of "something for nothing." It does not
take a degree in economics to see the fallacy of
this "take what you can now and worry about the
future later" approach.

The Attorney General, for Second Injury Fund,
noted that the fund is supported by a levy on
insurance carriers based upon fund expenditures
and proceeded to say:

"As insurance companies have to pay more, either in
benefits or in assessments, their charge to employers
also increases. *Self-insured employers must bear in-*
*creases directly.* Thus, every employer and insurance
carrier is affected by laws and court decision which
define total and permanent disability. *In order to keep*
*their cost down, the employers must screen out job*
*applicants presenting medical problems which are*
*likely to result in extensive workmen's compensation*
*payments and medical expenses.* If 20/200 uncorrected

vision is held to be equivalent to loss of an eye for workmen's compensation purposes, regardless of the fact that such vision may be corrected to normal or nearly so with glasses, *then employers will be forced to view individuals with such vision as already blind in at least one eye and consider this factor in hiring.* Individuals with poor, uncorrected vision would have to be considered handicapped despite the fact they could function normally with glasses."[2] (Emphasis added.)

Small businesses and especially those with a small margin of profit experience the greatest impact. Large or small, the cost of doing business in Michigan already has been much affected by our extensions of the Workmen's Compensation Act. When the burdens become too great, businesses terminate, move to another state, cut employment, raise costs to the consumer (including the workman) within the limits of competitive realities or take other steps to curtail costs. In this case, the initial probability is that those hiring will make a predetermination of uncorrected "sight" or "vision" and the result will be hiring of fewer persons within that new class of "the handicapped".[3]

I would reverse the Court of Appeals and affirm the Workmen's Compensation Appeal Board as to part II.

MEMORANDUM OPINION. On September 7, 1962, plaintiff-appellant, Edward J. Hakala, received an injury which arose out of and in the course of his employment with Burroughs Corporation. As a result of this injury Mr. Hakala suffered the am-

---

[2] See similar concerns indicated in the dissent in *Komendera v American Bar & Cabinet Manufacturers,* 390 Mich 305; 212 NW2d 173 (1973).

[3] At least two Justices of this Court and attorney for plaintiff fall within that new class.

putation of his right hand and portions of the first and second fingers of his left hand. The Burroughs Corporation paid workmen's compensation benefits on a voluntary basis for these losses.

On June 17, 1968, appellant filed a petition for a hearing with the Bureau of Workmen's Compensation claiming eligibility for total and permanent disability benefits from defendant-appellee Second Injury Fund. Appellant offered uncontroverted evidence that prior to his injury at Burroughs Corporation, he was afflicted with a vision impairment in his left eye.[1] After the matter was heard, the referee rendered a decision on June 13, 1969, stating in relevant part:

"It is further ordered that as a result of said injury employee's right hand was amputated at the wrist and the first and second fingers of the left hand were amputated beyond the first joint and that compensation for such amputations was properly paid to 2/27/68

---

[1] Appellant's proof of the loss of vision in his left eye consisted of a letter from ophthalmologist, Sheldon D. Stern, M.D. The parties stipulated to allow the letter to be introduced into evidence. It read:

"Edward Hakala was examined by me on 6/29/68 with a history that his vision in the left eye had always been bad. He had received no treatment for it but he states, however, that his eyes were checked 35 years ago when he first started to work at Burroughs and he was told that his vision could not be brought up to normal, that it was out of focus. He states that he lost an arm in a punch-press in 1962. Vision in the right eye, without correction, was 20/100 plus or minus one. In the left eye it was 20/300. With correction, his vision in the right eye was 20/15 and in the left eye 20/50 minus one. He required a prescription of $+200 = .50 \times 150$ O.D. and a $+4.50 = -.50 \times 15$ with an add of $+.200$ in each eye. His extraocular muscles were normal. External examination was normal. Pupils were equal and reacted to light. There was no evidence of any cataract formation. Intraocular pressures revealed no evidence of any glaucoma. Examination of the retina revealed no retinal abnormalities or abnormalities of his optic nerve. This diagnosis was a left amblyopia, secondary to anisometropia. In other words, he has a reduction of vision which will not respond to treatment in the left eye, secondary to a marked difference in his refractive error. The left eye is much more farsighted than the right eye and he has always preferred the right eye. There is no further treatment which will improve the vision in this eye."

inclusive. It is further held that, prior to 9/7/62, for non-occupational reasons, said employee had lost the industrial vision in his left eye, his uncorrected vision being determined to be 20/300, being less than 20%, vision in the eye [corrected—said vision is better than 20% but we consider only uncorrected vision—see *Lindsay v Glennie Industries,* 379 Mich 573 (153 NW2d 642 [1967])]."

Plaintiff was accordingly awarded total and permanent disability benefits from the Second Injury Fund based on the prior loss of an eye and the loss of his right hand at Burroughs Corporation. MCLA 412.8a; MSA 17.158(1).[2]

The Second Injury Fund appealed the decision of the referee to the Workmen's Compensation Appeal Board. On February 24, 1972, the appeal board reversed the referee. It held that appellant's claim was properly controlled by *Hirschkorn v Fiege Desk Co,* 184 Mich 239; 150 NW 851 (1915); *Cline v Studebaker Corp,* 189 Mich 514; 155 NW 519; 1916C LRA 1139 (1915), and must be judged with reference to a corrected vision standard. Since appellant retained more than 20% of normal vision in his left eye with the use of glasses, the appeal board concluded that there was no prior loss of the eye and denied appellant Second Injury Fund benefits.

Appellant appealed to the Court of Appeals. The Court of Appeals affirmed the result of the appeal board but did so under a completely different legal theory. The Court of Appeals assumed that uncorrected vision was the proper standard, but then held that MCLA 412.8a; MSA 17.158(1) awards Second Injury Fund benefits only if the prior loss was the result of an *injury.* Since appellant's loss of vision was due to nontraumatic causes, the

---

[2] Now MCLA 418.521(1); MSA 17.237(521)(1).

Court of Appeals deemed him ineligible for benefits. *Hakala v Burroughs Corp,* 48 Mich App 639; 211 NW2d 60 (1973).

Plaintiff filed an application for leave to appeal in the Supreme Court, which we granted. 391 Mich 756 (1974).

The parties present two issues:

1. Must an injured worker's prior loss be due to an injury in order to qualify for permanent and total disability benefits from the Second Injury Fund?

2. When a claim is made for Second Injury Fund benefits based on a prior loss of 80% vision in one eye, should the degree of vision loss be measured in terms of corrected or uncorrected vision?

I

This first issue represents a somewhat unique situation in that appellee specifically agrees with appellant's position that the prior loss need not be due to an injury in order to qualify for Second Injury Fund benefits. In fact, after the opinion of the Court of Appeals was handed down, all three parties to that appeal joined in seeking a hearing in order to urge the Court of Appeals to reverse the position that it had adopted.

In our opinion, the position adopted by the Court of Appeals on this issue is in error. The legislative purpose behind the creation of the Second Injury Fund "was to enhance the prospects for employment of certain handicapped persons who had previously sustained specific losses, so that they and their families would have a means of livelihood. The statute made it certain, as an inducement to an employer to employ such persons, that in employing a handicapped person he

would be required to pay no more if such handicapped person should suffer further injury than he would have been required to pay for such further injury had the person not been handicapped in the first place." *Verberg v Simplicity Pattern Co,* 357 Mich 636, 643; 99 NW2d 508 (1959). It would make little sense, and it would be contrary to this Court's prior interpretation of legislative intent, to distinguish between handicapped persons on the basis of the origin of their handicap. The act's purpose certainly would not be furthered by such a distinction, and we have not been able to hypothesize any reasonable rationale on which this distinction could be founded. We therefore reverse the Court of Appeals on this first issue.

## II

The controversy between the parties in the present case is limited to the second stated issue. Under the provisions of MCLA 418.361(1)(l); MSA 17.237(361)(1)(l), the loss of an eye for the purposes of the Workmen's Compensation Act is defined as an "[e]ighty percent loss of vision". The question before us is whether a claimant's vision should be assessed with or without the use of corrective lenses. In the present case it is agreed between the parties that if an uncorrected vision standard is proper, appellant has less than 80% vision and meets the statutory definition for the loss of an eye. Conversely, it is agreed that if a corrected vision test is adopted, appellant does not meet the definition for the loss of an eye and was correctly denied benefits from the Second Injury Fund.

In its opinion, the Workmen's Compensation Appeal Board held that the present issue was controlled by *Hirschkorn v Fiege Desk Co,* 184 Mich 239; 150 NW 851 (1915); *Cline v Studebaker*

*Corp,* 189 Mich 514; 155 NW 519 (1915), and, accordingly, applied a corrected vision test. In arriving at this decision, the appeal board factually distinguish the more recent case of *Lindsay v Glennie Industries, Inc,* 379 Mich 573; 153 NW2d 642 (1967), from the Hakala claim. Its analysis of *Lindsay* concentrated on the fact that claimant Lindsay sustained the surgical removal of his natural lens necessitated by a cataract condition. The appeal board interpreted *Lindsay* to hold that the fact of the removal of a natural lens alone constituted the loss of the eye for statutory purposes. It then read any reference to an uncorrected vision standard contained in *Lindsay* as irrelevant to the decision.

In contrast to the analysis of the Workmen's Compensation Appeal Board, we believe that appellant Hakala's claim is factually and legally controlled by *Lindsay* and the subsequent case of *Hilton v Oldsmobile Division of General Motors Corp,* 390 Mich 43; 210 NW2d 316 (1973). Although both *Lindsay* and *Hilton* did concern the removal of a natural lens, this fact cannot be used to distinguish them from the present appeal. The Court in *Lindsay* did not base its decision on the loss of a lens per se. Rather, the Court founded its decision on the changes brought about by the 1943 amendment to the Workmen's Compensation Act. 1943 PA 245. In 1943, the Legislature replaced the strict "loss of an eye" wording on which *Cline* and *Hirschkorn* were based with new language that defined the loss of an eye as an "80% loss of vision". *Lindsay* held that the plain meaning of this amended language required the eye to be tested without the benefit of any artificial device. We repeat below language from *Lindsay* that was quoted with approval in *Hilton:*

"We recognize that substituting an artificial lens has 'restored' vision to the otherwise sightless eye. We point out that a specific loss award is not made as compensation for diminution of use of the involved organ or member. It is not awarded to compensate for loss of earnings or earning capacity. It is awarded irrespective of either fact or both. If ophthalmological advances and refinements in the use of contact lens has in fact rendered the amended statute inconsonant with its original legislative intent, it is the province of the legislature to say so. We construe the statute in the plain meaning of its wording." 379 Mich 573, 578.

Appellee has cited several examples of employment requirements and cases from other jurisdictions which adopt the corrected vision standard. Such material would be more persuasive to us if we were addressing this problem for the first time. *Lindsay* and *Hilton* have interpreted the language of the act to require an uncorrected vision standard and the Legislature has not since modified the language of the controlling sections. We therefore continue to follow these cases.

We do note that the *Lindsay-Hilton* position is not without some contradiction even in the post-1943 case law. Appellee relies strongly on the case of *Marrs v Ford Motor Co,* 315 Mich 211; 23 NW2d 638 (1946). In *Marrs,* the claimant, due to a prior cataract removal, possessed only 20/200 uncorrected vision in his right eye and could not coordinate it with his good left eye. With the use of glasses, claimant's vision was restored to 20/40 in the right eye. An industrial accident at Ford Motor Company resulted in the total loss of vision in claimant's eye. The Department of Labor and Industry denied compensation. It ruled that since claimant's pre-injury uncorrected vision was less than 20%, he had no eye to lose under the terms of the 1943 amendment. This Court reversed the

department and awarded benefits, apparently deciding the case on the basis of a corrected vision standard.

*Marrs,* while never overruled, was not extended beyond its unique facts. Three years later in the case of *Edwards v United States Rubber Co,* 325 Mich 203; 38 NW2d 319 (1949), the Court adopted the uncorrected vision standard subsequently employed in *Lindsay* and *Hilton.* Claimant Edwards was injured at work when a loose wire from a revolving wire brush struck his left eye and penetrated the cornea. As a result of this injury, a cataract developed which necessitated surgical removal. The vision loss in claimant's left eye was 98% uncorrected, and 25% when corrected; although, even with the use of corrective lenses, the left eye could not be coordinated with the uninjured right eye.

Justice BOYLES, writing for the Court in *Edwards,* initially assumed for the purposes of argument the continuing validity of *Cline* and the corrected vision standard. He then distinguished the *Edwards* case from *Cline* stating, "Cline had coordinated vision between the injured eye and his remaining good eye after the injury had been corrected by the use of glasses; which the plaintiff in the instant case would not have". 325 Mich 203, 207. See, *Lindhout v Brochu & Hass,* 255 Mich 234; 238 NW 231 (1931). The actual decision in *Edwards,* however, was based on an uncorrected vision standard. The language of Justice BOYLES' opinion warrants no other conclusion. The Court, mindful that Edwards had an 80% loss of vision under only the uncorrected standard, awarded compensation stating in part:

"In the case at bar, the employee has not yet had compensation for the specific loss of his left eye. In the

final analysis, an employee who has suffered 80 per cent. loss of vision of one eye, since the 1943 amendment, has suffered the total loss of that eye and is entitled to compensation. It is the injury to an eye, resulting in 80 per cent. loss of vision in the eye itself, for which the statute now allows compensation for the specific loss of an eye." 325 Mich 203, 210.

## III

To summarize, we believe that our case law, with minor exception, upholds the arguments advanced by appellant Hakala. Appellant's prior loss of vision should have been determined under an uncorrected vision standard. Under this standard the vision in his left eye is less than 20% (or conversely, appellant has suffered more than an 80% loss of vision in that eye). Appellant thereby has statutorily lost his left eye and under the facts of this case is eligible for Second Injury Fund benefits. See *Kunde v Teesdale Lumber Co,* 52 Mich App 360, 365–367; 217 NW2d 429 (1974).

The Court of Appeals is reversed and this case remanded to the Workmen's Compensation Appeal Board for the entry of an order in conformity with today's opinion.

Costs to appellant.

WILLIAMS, J., concurred in the memorandum opinion.