**Michigan Supreme Court**
**Lansing, Michigan 48909**

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

# Opinion

**FILED JANUARY 23, 2002**

SCOTT M. CAIN,

      Plaintiff-Appellee,

v                         No. 116389

WASTE MANAGEMENT, INC. and
TRANSPORTATION INSURANCE COMPANY,

      Defendants-Appellants.
_____

SCOTT M. CAIN,

      Plaintiff-Appellee,
      Cross-Appellant,

v                         No. 116945

WASTE MANAGEMENT, INC. and
TRANSPORTATION INSURANCE COMPANY,

      Defendants-Appellees,
and

SECOND INJURY FUND (TOTAL AND
PERMANENT DISABILITY PROVISION).

      Defendant-Appellant,
      Cross-Appellee.

_____

SCOTT M. CAIN,

      Plaintiff-Appellee,

v                                                 No. 116953

WASTE MANAGEMENT, INC. and
TRANSPORTATION INSURANCE COMPANY,

      Defendants-Appellants,
and

SECOND INJURY FUND (TOTAL AND
PERMANENT DISABILITY PROVISION).

      Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

TAYLOR, J.

The issue in this case concerns the proper standard for determining whether an injured employee is entitled to collect worker's compensation benefits for total and permanent disability pursuant to MCL 418.361(3)(g).[1] Specifically, the question is whether such a person's injured limb or member should be evaluated in its "corrected" or "uncorrected" state. The Worker's Compensation Appellate Commission (WCAC) held

---

[1] We also are satisfied that the WCAC should have considered plaintiff's specific loss claim regarding his left leg. While this claim may not have been pleaded as specifically as it should have been, we discern no prejudice or surprise. Accordingly, we remand this claim to the WCAC for resolution. As for the remaining issues in this case, we are no longer persuaded that they should be reviewed by this Court. Therefore, we vacate our order granting leave to appeal regarding all other issues and deny leave to appeal regarding those issues.

that a "corrected standard" should be applied, whereas the Court of Appeals held that an "uncorrected standard" was applicable.

In keeping with prior decisions of this Court, and for the reasons set forth below, we reverse in part the judgment of the Court of Appeals and hold that § 361(3)(g) envisions that a "corrected" standard be applied.

I

We begin by noting that this case involves a fairly uncommon kind of claim for worker's compensation benefits. The worker's compensation act provides, if certain conditions are met, for payments to workers who are injured or become disabled on the job. MCL 418.101 *et seq.* The most common situation is controlled by the general disability provision. MCL 418.301(1) provides that an employee, who receives a personal injury arising out of and in the course of employment for an employer who is subject to this act at the time of the injury, shall be paid compensation as provided in this act. If such a showing is made, one must then determine if the disability is total or partial. Payment formulas are set by statute.

In addition to these more common claims for disability benefits, the act provides compensation for the loss of certain body parts. These are known as "scheduled"

3

disabilities.  MCL 418.361(2).  For example, if a worker loses his foot at work he is given payments for 162 weeks.  Loss of an arm results in payments for 269 weeks.  These are known as "specific loss" benefits.

If a worker suffers from certain enumerated injuries, such as loss of both hands or both feet, he may be entitled to benefits for total and permanent disability, as defined by MCL 418.361(3).  As explained more fully hereinafter, such total and permanent disability benefits are a type of scheduled benefit, but they are distinct from the scheduled specific loss benefits.  Total and permanent disability benefits are intended for those who sustain the more catastrophic loss of more than one member.

"Loss of industrial use" is a special category of total and permanent disability benefits found in MCL 418.361(3)(g).  This category allows recovery for total and permanent disability where there is no anatomical loss, but where there is a loss of industrial use.  Hence, for example, even if an employee does not suffer actual amputation of one or both legs so as to qualify for specific loss benefits, he may nevertheless be entitled to scheduled benefits for injury to both legs if he has lost the "industrial use" of his legs.  In this way  the "loss of industrial use" category of total and permanent benefits differs from other total and permanent

4

categories.[2]

The case at bar involves this distinctive "loss of industrial use" kind of total and permanent disability claim.

## II

Plaintiff Scott M. Cain worked as a truck driver and trash collector for defendant, Waste Management, Inc. In October 1988, as he was standing behind his vehicle emptying a rubbish container, he was struck by an automobile that crashed into the back of the truck. Mr. Cain's legs were crushed. Physicians amputated Mr. Cain's right leg above the knee. His left leg was saved with extensive surgery and bracing.

In February 1990, Mr. Cain was fitted with a right leg prosthesis, and he was able to begin walking. He returned to his employment at Waste Management and started performing clerical duties.

Mr. Cain's left leg continued to deteriorate. In October 1990, he suffered a distal tibia fracture. Doctors diagnosed it as a stress fracture caused by preexisting weakness from the injury sustained in the accident. After extensive physical therapy and further surgery on his left knee, Mr.

---

[2] Total and permanent benefits are payable without regard to loss of wage earning capacity except for the distinctive industrial use loss category. *Redfern v Sparks-Withington Co,* 403 Mich 63, 80; 268 NW2d 28 (1978).

Cain was able to return to Waste Management in August 1991, first working as a dispatcher and then in the sales department.

Waste Management voluntarily paid Mr. Cain 215 weeks of worker's compensation benefits for the specific loss of his right leg. MCL 418.361(2)(k). However, there was disagreement concerning whether he was entitled to additional benefits.

III

In August 1992, Cain filed a petition with the Bureau of Worker's Compensation, seeking total and permanent disability benefits, which stated:

> My legs were crushed in a motor vehicle accident resulting in an amputation above the knee of my right leg. The severity of my injuries to my left leg result [sic] in the industrial loss of use of both legs. I am, therefore, entitled to permanent and total disability benefits.

At the end of the second day of the hearing, Mr. Cain moved to amend his petition to include a claim for the specific loss of his left leg. The magistrate denied the motion. Less than a week later, Mr. Cain filed a petition requesting benefits for the specific loss of the left leg:

> In addition to my initial application, I am claiming specific loss of my left lower extremity for dates of injury of 10/25/88 and 10/21/90. On 10/21/90, while walking down a ramp at home, I refractured my left tibia causing it to become necessary for me to wear a permanent brace on my left leg.

In December 1993, the magistrate awarded specific loss benefits (to be paid consecutively) for the loss of both legs. Although he had denied the motion to add a claim for the specific loss of the left leg, the magistrate nonetheless awarded the benefits, reasoning that Mr. Cain's assertion of the loss of the industrial use of both legs implicitly included a claim for the specific loss of the left leg.

The magistrate found that the left leg had been effectively lost in October 1990, when the stress fracture occurred and "any hope of restoring the member was abandoned."

> The condition of the Plaintiff's left leg subsequent to 10/21/90 appears to be tantamount to amputation. He cannot support himself without the brace which was fashioned for him. The Plaintiff is in effect wearing a prosthetic device on the left leg.

Thus, he ruled that the Second Injury Fund would be obligated to pay benefits for total and permanent disability because Mr. Cain had lost the industrial use of both legs.[3]

Waste Management and its insurer appealed to the WCAC, which reversed the judgment of the magistrate in April 1997.

---

[3] Total and permanent disability, compensation for which is provided in MCL 418.351, means:

> (g) Permanent and total loss of industrial use of both legs or both hands or both arms or 1 leg and 1 arm; for the purpose of this subdivision such permanency shall be determined not less than 30 days before the expiration of 500 weeks from the date of injury. [MCL 418.361(3)]

The WCAC ruled that, in light of the phrasing of Mr. Cain's initial petition to the bureau, the magistrate had erred in awarding benefits for the specific loss of the left leg. The WCAC also held that the magistrate had committed legal error in his analysis of the total and permanent disability claim, since he had failed to use a "corrected" standard to examine the remaining usefulness of Mr. Cain's *braced* leg. Applying such a standard, the WCAC concluded that Mr. Cain is not totally and permanently disabled.

In May 2000, the Court of Appeals affirmed in part, reversed in part, vacated in part, and remanded for further proceedings.[4] The Court of Appeals affirmed the WCAC's denial of specific loss benefits, agreeing that Mr. Cain's petition did not state a claim for such benefits. However, the Court of Appeals reversed and vacated with regard to the finding of total and permanent disability, stating:

> We reverse that portion of the WCAC's decision which holds that a claim for [total and permanent] disability benefits must be analyzed under the corrected test. While use of the corrected test is mandated in vision cases, [*Hakala v Burroughs Corp (After Remand)*, 417 Mich 359; 338 NW2d 165 (1983)], and has been expanded to cases involving implants,

---

[4] When Mr. Cain first applied for leave to appeal, his application was denied by the Court of Appeals. Unpublished order, entered August 7, 1997 (Docket No. 203539). However, this Court remanded the case for consideration as on leave granted. 459 Mich 863 (1998). The Court of Appeals decision was by unpublished opinion per curiam, issued May 2, 2000 (Docket No. 214445).

8

[*O'Connor v Binney Auto Parts*, 203 Mich App 522; 513 NW2d 818 (1994)], its use has not been extended to cases involving prosthetics or braces. In the instant case, plaintiff wears a prosthetic right leg and a brace on his left leg. The brace is not permanently attached to plaintiff's leg. In holding that use of the corrected test was required in this case, the WCAC read *Hakala*, *supra*, and *O'Connor*, *supra*, too broadly.

The issue whether a claimant has suffered loss of industrial use is one of fact. *Pipe v Leese Tool & Die Co*, 410 Mich 510, 527; 302 NW2d 526 (1981). We hold that the WCAC exceeded its authority by applying the corrected test to make initial findings of fact regarding whether plaintiff had suffered the loss of industrial use of his legs. Such initial findings are within the exclusive province of the magistrate. [*Layman v Newkirk Electric Associates, Inc*, 458 Mich 494; 581 NW2d 244 (1998)].[5] We vacate that portion of the WCAC's decision denying plaintiff's claim for [total and permanent] disability benefits and remand with instructions that the WCAC apply the uncorrected test to plaintiff's claim. If necessary, the WCAC may further remand the case to the magistrate for additional findings of fact. *Id.*; MCL 418.861a(12); MSA 17.237(861a)(12).

Applications for leave to appeal were filed by Waste Management, Inc., and the Second Injury Fund. Mr. Cain responded with an application for leave to appeal as cross-appellant. We granted all three applications and invited amicus curiae participation.[6]

---

[5] We overruled *Layman* to the extent that it clearly misstated the law with regard to the WCAC's authority to make independent factual findings in *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 697; 614 NW2d 607 (2000). Our opinion in *Mudel* was issued approximately two months after the Court of Appeals issued its opinion.

[6] 463 Mich 995-996 (2001).

We address only one issue: whether the "corrected" standard of *Hakala,* applied to a vision claim pursuant to MCL 418.361, should be applied to a permanent and total loss of industrial use of both legs claim pursuant to MCL 418.361(3)(g).

In *Hakala*, a worker with a preexisting vision disability[7] suffered the loss of a hand. This second loss gave rise to the issue whether he was totally and permanently disabled under the predecessor of MCL 418.521(1). The parties turned to the predecessor of MCL 418.361(2)(l) for the rule that eighty percent loss of vision in an eye constitutes total loss of that eye. As it happened, Mr. Hakala's *uncorrected* vision loss was greater than eighty percent, but his corrected vision did not constitute an eighty-percent loss.[8]

The question whether to gauge Mr. Hakala's vision in its corrected or uncorrected state had led to a division in the Worker's Compensation Appeal Board panel that decided the

---

[7] The vision disability was not work-related. 417 Mich 361. See also 399 Mich 162, 176, n 1; 249 NW2d 20 (1976), and 393 Mich 153, 157, n 1; 224 NW2d 27 (1974).

[8] The "correction" at issue in *Hakala* was evidently the product of ordinary corrective-lens glasses. See *Hakala v Burroughs Corp*, 393 Mich 153, 160; 224 NW2d 27 (1974) (opinion of SWAINSON, J.), on rehearing 399 Mich 162; 249 NW2d 20 (1976).

case.  In our *Hakala* opinion,[9] we resolved the matter in this fashion:

> In *Nulf* [*v Browne-Morse Co*, 402 Mich 309; 262 NW2d 664 (1978)], we refused to extend the "uncorrected" vision test to total and permanent claims, although we had adopted such a test for specific loss claims in *Lindsay v Glennie Industries, Inc*, 379 Mich 573; 153 NW2d 642 (1967).

> We observed:

> > "In *Hakala v Burroughs Corp (On Rehearing)* [399 Mich 162; 249 NW2d 20 (1976)], this Court recognized that the question of Second Injury Fund benefits in situations involving the loss of an eye could not be adequately resolved by the universal adoption of either the "uncorrected vision" test or the "corrected vision" test.  The Court held that the question of entitlement to Second Injury Fund benefits must be determined by reference to the statutory language creating those benefits found in MCL 418.521; MSA 17.237(521), which requires a determination of whether the employee has suffered a "permanent disability in the form of the loss of a[n] . . . eye."  The determination of whether a loss is a permanent disability within the meaning of that section must be evaluated in terms of the underlying legislative purpose of aiding the handicapped in obtaining and maintaining employment." [*Nulf*] 402 Mich 312-313.

> We are persuaded that the Legislature intended compensation for a specific loss without regard to whether the vision could be "corrected" or restored after the injury.  *Lindsay*, *supra*.

> We are now persuaded that the Legislature intended that a different standard be used in determining total and permanent disability inasmuch as it provided that only "total and permanent loss of sight" would constitute the qualifying eye loss for such benefits.  We are satisfied that to carry

---

[9] As indicated in footnote 7, this actually was our third opinion in *Hakala*.

11

out the legislative intent a "corrected" vision standard should hereafter be used in assaying claims for total and permanent disability involving the loss of sight.

We conclude that in this connection that is the sense in which the term "permanently disabled" is used for the purposes of the Second Injury Fund. [417 Mich 363-364.]

We have not had occasion subsequently to elaborate upon or clarify the rule of *Hakala*. As noted in its opinion in the present case, the Court of Appeals has extended the principle only so far as cases involving "implants," such as the knee replacement surgery discussed in *O'Connor*.[10]  203 Mich App 522.

---

[10] In *O'Connor, supra* at 534, the Court of Appeals approved a distinction offered by an earlier panel in *Tew v Hillsdale Tool & Mfg Co*, 142 Mich App 29, 35-37; 369 NW2d 254 (1985), where an employee was forced to wear a special orthopedic boot following an injury that resulted in amputation of a great toe:

If by some medical procedure an object or device is attached to or implanted in the injured member, it has become part of the body. . . . In contrast, plaintiff's boot is not part of the foot on which he wears it. Medical science has done  to better the condition of the foot itself. An arm or leg which contains a surgically inserted pin is, nevertheless, an arm usable in industry without an external aid.

*      *      *

[A] similar distinction can and should be made between artificial devices or objects which are made part of the body, and external aids which merely enable a person to accomplish what the limb or member cannot do on its own.

V

The question whether MCL 418.361(3)(g) requires application of a "corrected" or "uncorrected" standard in the present case is a legal question, which we review de novo. *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 697, n 3; 614 NW2d 607 (2000).

Ultimately, entitlement to worker's compensation benefits must be determined by reference to the statutory language creating those benefits. *Nulf* at 312.

As previously indicated, total and permanent disability, compensation for which is provided in MCL 418.351, means:

> (g) Permanent and total loss of industrial use of both legs or both hands or both arms or 1 leg and 1 arm . . . . [MCL 418.361(3).]

We conclude that the words "permanent" and "total" indicate the Legislature intended a "corrected" test. We agree with the *O'Connor* Court*, supra* at 533, that

> [t]he concept of permanence is necessarily one of status, involving an assessment of medical deterioration, stabilization, or improvement, and consideration of medical treatment options.[11]

Moreover, as indicated in *Hakala* and *Nulf*, the ordinary meaning of the word "permanent" suggests a condition or injury that cannot be improved or made functional.

The word "total" similarly suggests a situation that cannot be corrected. Further, the use of the phrase "industrial use" in this section itself implies the kind of

13

functional analysis that is implicit in the "corrected" standard of MCL 418.351. This phrase modifies "permanent and total loss" and effectively limits the coverage of this provision to only certain kinds of permanent and total losses, to wit, those that have adverse implications for the ability of an employee to carry out his industrial responsibilities. Different forms of serious injury may carry altogether different consequences in terms of the ability of an employee to perform his "industrial" responsibilities. The express language of MCL 418.351, in particular the phrase "industrial use," makes these different consequences relevant.

There certainly exist conditions that *can* be overcome, and we have previously held that the Legislature intended that poor vision, correctable with glasses, be evaluated in its corrected state. No sound distinction would lead to a different result in the case of a limb that, like vision corrected by glasses, can function with the aid of an external device. Where the legal inquiry is the effect of the work injury on a worker's use of members *in industry*, that effect can only be reasonably measured by use of the members as aided and corrected, whether by the devices listed in MCL 418.315(1)[11] or otherwise.

---

[11] We note that pursuant to MCL 418.315(1), employers subject to the act must provide injured employees

14

The Court of Appeals opined that the WCAC had read *Hakala* and *O'Connor* too broadly.  However, in actuality, and as indicated above, it is the Court of Appeals that read *Hakala* too narrowly.[12]

In considering the present issue, we have remained cognizant of the distinction between specific loss benefits and total and permanent disability benefits.  As mentioned at the beginning of the opinion, they are unique categories with substantial differences.  In its April 1997 decision, the WCAC included this analysis, which we adopt as our own:

> We believe that the historical distinction repeatedly recognized by the appellate courts throughout the long interpretational history of the two statutory provisions continues to provide an important divider between the specific loss entitlements and the total and permanent disability entitlements established under the statute.

---

crutches, artificial limbs, eyes, teeth, eyeglasses, hearing apparatus, and other appliances necessary to cure, so far as is reasonably possible, and relieve from the effects of injury.

[12] As indicated in n 10, both *Tew* and *O'Conner* distinguished between artificial devices or objects that are made part of the body and external aids that merely enable a person to accomplish what the limb or member cannot do on its own.  *O'Conner* at 534, citing *Tew* at 36-37.  We cannot agree with this distinction because it has no basis in the language of the statute.  The distinction is also contrary to *Hakala,* which required consideration of glasses that clearly are an external device.  Whether a corrective device is external or internal is of no importance in determining whether a claimant has suffered a permanent and total loss of the industrial use of a limb.

An even more significant contrast between the two entitlements concerns the question of whether loss is measured with the help of prosthetics or without. The test for specific loss is clearly an uncorrected test. In *Lindsay v Glennie Industries Inc,* 379 Mich [573] (1967), the plaintiff suffered an injury that compelled surgical removal of his cataract, but even though he had virtually no sight in that eye, the subsequent use of contact lenses enabled him to enjoy virtually full vision. The Supreme Court reversed the lower court's finding that no specific loss could be found because plaintiff's vision had been restored, and stated that the proper analysis should take place without the corrective procedure. The *Lindsay* Court stated:

"We recognize that substituting an artificial lens has 'restored' vision to the otherwise sightless eye. We point out that a specific loss award is not made as compensation for diminution of the use of the involved organ or member. It is not awarded to compensate for loss of earnings or earning capacity. It is awarded irrespective of either fact or both." *Id*. at 578.

The Court noted that a plain reading of the statutory wording put forth a loss regardless of the correctability of the problem. Because the Court placed emphasis on the actual loss of the member or organ when determining specific loss, it viewed the loss in its uncorrected state.

Likewise, in *Tew v Hillsdale Tool & Mfg*, 142 Mich App 29 (1985), plaintiff caught his right foot in a conveyor, and suffered the amputation of his great toe. There was also loss of tissue from the second toe which decreased stability of the foot. Plaintiff wore a special shoe to aid in his walking ability. The Court held that prosthetic devices are not taken into account when determining specific loss in an industrial use analysis. The *Tew* court stated "We do not hold that anyone who wears any sort of prosthetic device has a valid specific loss claim, but only that the device should not be considered in measuring the disability." *Id.* at 35.

16

On the other hand, the test for total and permanent disability is a corrected test. In *Hakala v Burroughs Corp (After Remand)*, 417 Mich 359 (1983), plaintiff claimed total and permanent loss by bringing forth a pre-existing non-occupational impairment of vision with the work-related loss of his right hand. The Supreme Court denied total and permanent loss benefits due to the fact that the "corrected" standard had to be used.

"We are persuaded that the Legislature intended compensation for a specific loss without regard to whether the vision could be 'corrected' or restored after the injury. *Lindsay, supra*.

"We are now persuaded that the Legislature intended that a different standard be used in determining total and permanent disability inasmuch as it provided that only 'total and permanent loss of sight' would constitute the qualifying eye loss for such benefits. We are satisfied that to carry out the legislative intent a 'corrected' vision standard should hereafter be used in assaying claims for total and permanent disability involving the loss of sight." *Id.* at 364.

With this statement a clear distinction was established for total and permanent disability benefits, using the corrected status of the member or organ. A closer look at why this distinction was made reveals a logic that leads back to the main purpose of having separate statutory provisions. The courts allow correction in the total and permanent setting because the focus is on the function of the member or organ that enables the claimant to earn a living. On the other hand, specific loss awards the claimant for the loss of the anatomical member, . . . and thus the uncorrected test is more appropriate.

In *O'Connor v Binney Auto Parts*, 203 Mich App 522 (1994), the Court determined that the corrected test applies beyond the special category of vision. In *O'Connor*, an amputee with a prosthesis below the left knee sought total and permanent loss benefits for his legs because the right leg was aggravated. The Court held that any corrective surgery to the right knee that would improve the claimant's

17

condition should be included in the evaluation as to whether claimant suffered industrial loss of use of his legs. . . . Essentially, *O'Connor* confirms the distinction that for determining specific loss benefits, prostheses are not considered, while when determining total and permanent loss, prosthetic devices and implants must be taken into consideration.

In summary, the specific loss and total and permanent disability entitlements in the statute are unique categories with substantial differences. They are separately identified in their own subsections. The focus of specific loss is on anatomical loss or its equivalent, irrespective of wage earning ability. In contrast, the focus of total and permanent disability is on the loss of wage earning capacity. While the test for specific loss is an uncorrected test, the test for total and permanent disability is a corrected test.

We conclude that the "corrected" standard applied in *Hakala* accords with the intent of the Legislature as expressed in the language of MCL 418.361(3)(g) and is properly applied in the present case.[13] In sum, total and permanent disability is not demonstrated where the proofs indicate that a braced limb is functional and can support "industrial use." MCL 418.361(3)(g).

---

[13] We note that our holding today, while not required by, is consistent with our holding in *Chmielewski v Xermac, Inc*, 457 Mich 593, 609; 580 NW2d 817 (1998) (whether a person is disabled under the Persons With Disabilities Civil Rights Act, MCL 37.1101 *et seq.*, is generally determined considering mitigating measures), and with *Sutton v United Airlines, Inc*, 527 US 471, 475; 119 S Ct 2139; 144 L Ed 2d 450 (1999) (whether a person is disabled under the federal Americans with Disabilities Act, 40 USC 12101 *et seq.*, should be made with reference to measures that mitigate the individual's impairment).

18

## VI

For these reasons, we reverse in part the May 2000 judgment of the Court of Appeals. We remand to the WCAC to consider plaintiff's specific loss claim. MCR 7.302(F)(1).

CORRIGAN, C.J., and CAVANAGH, WEAVER, YOUNG, and MARKMAN, JJ., concurred with TAYLOR, J.

KELLY, J., concurred in the result only.