No. 117,259

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

VIRGIL GILKEY,
*Appellant*,

v.

FREDERICK WATERPROOFING and TECHNOLOGY INSURANCE COMPANY,
*Appellees*.

SYLLABUS BY THE COURT

When calculating a work disability award, K.S.A. 2017 Supp. 44-510e(a)(2)(D) provides that if the employee has preexisting permanent restrictions, any work tasks that the employee would have been deemed to have lost the ability to perform had a task loss analysis been completed prior to the injury at issue shall be excluded when calculating the task loss directly attributable to the current injury. A permanent restriction is one that is continuing or enduring without fundamental or marked change and not subject to fluctuation or improvement. Accordingly, whether the employee has preexisting permanent restrictions is based on the employee's status immediately prior to the new injury. In this case, in which the employee worked for 12 years before the new injury without restriction, task losses that might theoretically have been in place based upon an earlier injury are not considered when applying K.S.A. 2017 Supp. 44-510e(a)(2)(D).

Appeal from Workers Compensation Board. Opinion filed April 20, 2018. Reversed and remanded with directions.

*Jan L. Fisher*, of McCullough, Wareheim & LaBunker, of Topeka, for appellant.

*Kendra M. Oakes*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for appellees.

Before GREEN, P.J., BUSER and LEBEN, JJ.

1

BUSER, J.: Virgil Gilkey appeals the Kansas Workers Compensation Board's (Board) interpretation and application of K.S.A. 2014 Supp. 44-510e(a)(2)(D), which resulted in the Board's finding that he had a net task loss of zero percent which adversely reduced his disability award.

Upon our review, we conclude that K.S.A. 2014 Supp. 44-510e(a)(2)(D) requires the exclusion of theoretical work tasks for purposes of calculating the task loss directly attributable to the current injury, provided the employee has preexisting permanent restrictions that are continuing or enduring without fundamental or marked change and not subject to fluctuation or alteration.

Applying this statute to the uncontroverted facts of this case, although Gilkey was assigned work restrictions in 2001 after a work injury, we hold that he did not have preexisting permanent restrictions during the 12 years prior to his August 11, 2014 work injury because during those years he performed all of his work tasks involving heavy manual labor full time, without difficulty, and without any restrictions.

Accordingly, we reverse the Board's holding and remand with directions to reconsider the nature and extent of Gilkey's disability award without consideration of any preexisting work restrictions or theoretical task loss attributed to his 2000 work injury.

FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are not in dispute. At the time of the Board's ruling in 2017, Gilkey was 57 years old. In 1976, after high school, he earned a general education degree. In 1980, Gilkey received a construction certificate from a vocational school. He worked as a manual laborer in construction from 1976 until August 11, 2014.

2

In September 2000, while working for Holloways, Inc., Gilkey was injured in a work-related motor vehicle accident. As a consequence of the accident, Dr. George G. Fluter, M.D., Gilkey's treating physician, diagnosed probable right trochanteric bursitis, lumbar diskopathy without evidence of myelopathy or radiculopathy, and pain of the right hip, leg, and buttocks. In 2001, Dr. Fluter assigned an 8% permanent partial impairment rating to the body as a whole, and he recommended permanent restrictions which limited Gilkey's work to a light level of physical activity. Based primarily on Dr. Fluter's evaluation, about 5 months after his 2000 accident, Gilkey settled his workers compensation claim in February 2002 for a lump sum payment of $45,000. This settlement was a compromise based on a 38% disability to the body as a whole. The settlement did not include future medical treatment.

As the Board later found:

"Claimant testified he was unaware permanent restrictions had been imposed by Dr. Fluter in 2001. Claimant stated he performed construction work, including cement work, pipe laying, city housing, remodeling, and driveway work, between March 2000 and August 2014. *He did not work with any restrictions during that time*. Claimant testified he was able to perform his work tasks, all of which involved manual labor in the construction field, without difficulty. Claimant indicated he did not feel he was in need of any permanent work restrictions at that time." (Emphasis added.)

For 12 years—from 2002 until August 2014—Gilkey worked primarily as a caulker for Frederick Waterproofing and Roofing. His job tasks included loading and unloading supplies, setting up and tearing down scaffolding, demolition and hauling of debris such as bricks and roofing materials, mixing mud, installation of bricks and mortar, caulking, power washing, and installation and sealing of new roofs. These tasks required lifting up to 80 pounds, including repetitive bending, climbing, crouching, reaching, and carrying, which Gilkey performed without limitation or difficulty. During

3

the 12 years that Gilkey performed heavy manual labor he did not follow any permanent restrictions.

While working for Frederick Waterproofing on August 11, 2014, Gilkey was standing about 35 feet up on a ladder when it slid out from under him and he fell to the pavement. Gilkey landed on his right side and sustained injuries to his right hip, back, wrists, and legs. As a result, Gilkey underwent surgery to repair a hernia in October 2014, and surgery for a herniated disc in his lumbar spine the next month.

Gilkey filed a workers compensation claim for his 2014 injury. In April 2015, he returned to Dr. Fluter, the physician who treated him after his 2000 accident, for an independent medical examination. Based on his clinical evaluation and review of Gilkey's medical history, Dr. Fluter opined that the 2014 accident had resulted in an injury to Gilkey's lumbar spine with radiculopathy and right iliotibial band syndrome. Dr. Fluter opined that the prevailing factor for Gilkey's injuries, the need for medical treatment, and the resulting impairment was the August 2014 work-related injury. As a result, Dr. Fluter assigned Gilkey a total whole body impairment of 12% related to the 2014 work accident. Of note, Dr. Fluter explained that his 2015 impairment ratings were for different body parts than those he assigned in 2001. Dr. Fluter recommended future conservative treatment and recommended permanent restrictions of a light/medium physical demand level.

Two vocational rehabilitation experts, Paul Hardin and Steve Benjamin, compiled lists of work tasks Gilkey performed in the five years preceding his August 2014 injury. Hardin's list had 33 nonduplicative tasks, of which Dr. Fluter found 26 tasks that were eliminated by his suggested 2015 permanent restrictions, resulting in a 78.79% task loss. Benjamin's list contained 23 nonduplicative tasks, of which Dr. Fluter's 2015 restrictions eliminated 16 tasks, for a 69.6% task loss. Dr. Fluter testified that, with only one

4

exception, all of these same tasks would have also been eliminated based on his 2001 restrictions, had a task loss assessment been performed at that time.

Both Hardin and Benjamin opined that Gilkey faced significant and multiple barriers to returning to the open labor market due to his age, education, and physical restrictions. Frederick Waterproofing was unable to offer employment to Gilkey within the restrictions recommended by Dr. Fluter. Gilkey was unsuccessful in finding other work and, as of the date of the Board's ruling, he remained unemployed.

Upon review of the evidence in the workers compensation proceedings, the administrative law judge (ALJ) made the following findings:

> "[Frederick Waterproofing's] basic defense of this claim arises from the idea that [Gilkey's] restrictions from a previous injury eliminate the same tasks that his restrictions from the instant injury do. Respondent urges the court to decide that the claimant has suffered no new work disability. The court disagrees. The injuries suffered in this case are to different body parts, and therefore are new. Secondly, [Gilkey] testified . . . that he never worked under [his previous, unknown restrictions] from 2000 through 2015, instead continuing his construction career."

Based on these findings, the ALJ did *not* reduce Gilkey's task loss incurred because of the 2014 injury by the task loss that would have been incurred based on his 2001 restrictions, assuming a task loss assessment had been conducted at that time. The ALJ ruled that Gilkey had sustained a 31.25% wage loss and 74% task loss. Combining those two figures resulted in an award of a 53% work disability.

Frederick Waterproofing appealed the ALJ's award to the Board. In relevant part, the employer argued that Gilkey had "a zero percent task loss directly attributable to his current injury due to his preexisting permanent restrictions."

Upon the Board's review and as discussed more fully in the next section, the Board applied K.S.A. 2014 Supp. 44-510e(a)(2)(D) to the facts of this case and excluded the task losses theoretically incurred from the 2000 injury from those assessed after the 2014 injury. As a result, the Board concluded: "Having excluded the tasks contained on the lists provided by the vocational experts, the Board finds [Gilkey] has no task loss as the result of the injury giving rise to this appeal."

In a dissenting opinion, one Board member concluded:

"The language of K.S.A. 2014 Supp. 44-510e(a)(2)(D) is not as plain and unambiguous as the majority finds. The inclusion of the words 'had a task loss analysis been completed prior to the injury at issue' can be interpreted to constitute a qualifying event or condition precedent that must occur before the tasks may be excluded. There is no evidence in the record that a task loss analysis had been completed prior to August 11, 2014. Without such evidence of a prior task loss opinion, claimant's task loss should be based solely on his current restrictions, without a deduction based upon preexisting restrictions."

Gilkey appeals.

CALCULATION OF TASK LOSS UNDER K.S.A. 2017 SUPP. 44-510e(a)(2)(D)

Gilkey claims the Board erred in its interpretation and application of K.S.A. 2014 Supp. 44-510e(a)(2)(D). In particular, Gilkey contends the Board erred by reducing his actual task loss for his 2014 ladder injury due to the theoretical task loss for his 2000 motor vehicle injury. Gilkey argues that under 44-510e(a)(2)(D), he did not have any preexisting permanent restrictions that resulted in task loss because after his medical treatment for the 2000 injury he was employed as a construction laborer without any work restrictions for the 12 years immediately prior to his 2014 injury.

6

According to Gilkey, this erroneous interpretation and application of the statute adversely affected his work disability award. This is because the improper finding of theoretical task losses from his 2000 injury resulted in a net task loss of zero percent when the theoretical task losses from the 2000 injury were improperly deducted from the number of actual task losses assessed after Gilkey's 2014 injury. This error is consequential in the proper determination of work disability. Pursuant to K.S.A. 2017 Supp. 44-510e(a)(2)(C), work disability is calculated by averaging the percentage of post-injury task loss and the percentage of postinjury wage loss. Gilkey asks our court to reverse the Board's decision and remand his case to determine "the nature and extent of disability without consideration of any preexisting restrictions."

In response, Frederick Waterproofing contends the Board

"appropriately excluded work tasks which the employee would have been deemed to have lost the ability to perform, had a task loss analysis been completed prior to his injury, due to his preexisting permanent restrictions assigned by Dr. Fluter for the purposes of calculating the task loss which is directly attributable to his current injury."

According to Frederick Waterproofing, the Board's award should be affirmed because there was substantial evidence to support its finding that Gilkey had a "zero percent" task loss directly attributable to his 2014 injury when reduced by the theoretical task loss associated with his 2000 injury.

Our review is established by the Kansas Judicial Review Act, K.S.A. 77-601 et seq. The Act provides that a court reviewing an administrative action shall grant relief only if it determines that the agency violated one or more provisions of K.S.A. 2017 Supp. 77-621(c). In this case, Gilkey seeks review under K.S.A. 2017 Supp. 77-621(c)(4), which provides relief if the Board erroneously interpreted or applied the law. On appeal, the burden of proving the invalidity of the agency action rests with Gilkey as

7

the party asserting such invalidity. See K.S.A. 2017 Supp. 77-621(a)(1); *In re Equalization Appeal of Wagner*, 304 Kan. 587, 597, 372 P.3d 1226 (2016).

The question presented is one of law and requires our interpretation of K.S.A. 2017 Supp. 44-510e(a)(2)(D). The interpretation of a statute is a question of law that our court reviews de novo. *Fernandez v. McDonald's*, 296 Kan. 472, 475, 292 P.3d 311 (2013). We give no deference to the Board's interpretation of the statutory language. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010).

Some general principles of statutory construction guide our analysis. The primary purpose of statutory interpretation is to give effect to the intent of the Legislature. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). The first step of statutory interpretation is to attempt to determine the legislative intent by looking to the words of the statute giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). In this regard, our Supreme Court has instructed:

> "When a workers compensation statute is plain and unambiguous, this court must give effect to its express language rather than determine what the law should or should not be. The court will not speculate on legislative intent and will not read the statute to add something not readily found in it." *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607-08, 214 P.3d 676 (2008).

Turning to the language of the statute at issue, K.S.A. 2017 Supp. 44-510e(a)(2)(D) defines task loss as:

> "[T]he percentage to which the employee, in the opinion of a licensed physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the five-year period preceding the injury. The permanent restrictions imposed by a licensed physician as a result of the work injury shall be used to

8

determine those work tasks which the employee has lost the ability to perform. *If the employee has preexisting permanent restrictions, any work tasks which the employee would have been deemed to have lost the ability to perform, had a task loss analysis been completed prior to the injury at issue, shall be excluded for the purposes of calculating the task loss which is directly attributable to the current injury.*" (Emphasis added.)

In 2011 the Legislature revised K.S.A. 44-510e(a), as set forth above. See L. 2011, ch. 55, § 9. Notably, the pre-2011 statute did not reference "preexisting permanent restrictions." A review of caselaw has not revealed any on-point precedent interpreting this new subsection.

At the outset, the relevant facts necessary to determine this question of law are not disputed. Gilkey sustained a compensable motor vehicle injury in 2000, while working for a different employer. Upon the filing of his workers compensation claim, Dr. Fluter, in 2001, assigned Gilkey permanent work restrictions limiting him to a light level of physical activity. Shortly thereafter and for the next 12 years, Gilkey worked as a heavy manual laborer for Frederick Waterproofing without any restrictions. During this time, Gilkey performed his work without difficulty until his fall from the ladder in a work-related injury on August 11, 2014. It is also uncontroverted that Dr. Fluter found, as a result of the 2014 injury, that Gilkey had incurred a task loss range between 69% and 79%. Finally, Dr. Fluter testified that, with only one exception, all of these same tasks would have been eliminated given his assessment of Gilkey's restrictions in 2001, had a task loss assessment been performed at that time.

Given this factual context, we consider the first seven words of the last sentence of K.S.A. 2017 Supp. 44-510e(a)(2)(D):

"*If the employee has preexisting permanent restrictions*, any work tasks which the employee would have been deemed to have lost the ability to perform, had a task loss analysis been completed prior to the injury at issue, shall be excluded for the purposes of

9

calculating the task loss which is directly attributable to the current injury." (Emphasis added.)

What is the meaning of the phrase: "If the employee has preexisting permanent restrictions"?

At the outset, K.S.A. 2017 Supp. 44-508 provides definitions relevant to the Workers Compensation Act. This definitional statute, however, does not include the phrase, "preexisting permanent restrictions." As a result, the plain meaning of these words guides our analysis. In particular, we focus on the meaning of "permanent." Permanent is commonly defined as "continuing or enduring (as in the same state, status, place) without fundamental or marked change: not subject to fluctuation or alteration: fixed or intended to be fixed." Webster's Third New International Dictionary 1683 (1993). As the Michigan Supreme Court noted, "the ordinary meaning of the word 'permanent' suggests a condition or injury that cannot be improved or made functional." *Cain v. Waste Management, Inc.*, 465 Mich. 509, 520, 638 N.W.2d 98 (2002).

We note too that the phrase at issue—"If the employee *has* preexisting permanent restrictions"—is in the present tense. What is at issue here is the compensation Gilkey will receive for a specific injury, and the injury for which Gilkey's compensation is now being determined took place in August 2014.

One other phrase in K.S.A. 2017 Supp. 44-510e(a)(2)(D) is of significance. "If the employee has preexisting permanent restrictions," we then consider work tasks the employee would have been deemed unable to perform "had a task loss analysis been completed prior to the injury at issue." The statute does not tell us whether "prior to the injury" means *immediately* prior to the injury or at some earlier time. But when we consider that phrase ("prior to the injury") along with the concept of permanence and the present-tense language at the start of this statutory provision ("If the employee has

10

preexisting permanent restrictions"), the statute makes the most sense if we interpret it to apply only when the employee has a restriction that is truly permanent immediately prior to the new injury.

From a plain reading of K.S.A. 2017 Supp. 44-510e(a)(2)(D), we are persuaded the statute requires the exclusion of theoretical work tasks for purposes of calculating the task loss directly attributable to the current injury only if, immediately prior to the new injury, the employee has preexisting restrictions that are "continuing or enduring without fundamental or marked change and not subject to fluctuation or alteration." On the other hand, preexisting restrictions that are not "continuing or enduring without fundamental or marked change and not subject to fluctuation or alteration" are not permanent and, as a result, any theoretical work tasks which the employee would have been deemed to have lost the ability to perform, had a task loss analysis been completed at some earlier time, should not be excluded in the task loss calculation for the current injury.

Applying the law to the facts of this case, while Dr. Fluter, in 2001, assigned work restrictions for Gilkey, it is apparent that these restrictions were not permanent or "continuing or enduring without fundamental or marked change and not subject to fluctuation or alteration." This is because during the 12 years preceding the 2014 injury, as the ALJ determined, Gilkey "did not work under any restrictions." This finding was adopted by the Board which concluded that Gilkey "did not work with any restrictions" from 2002 until August 11, 2014. Moreover, the Board also cited Gilkey's uncontroverted testimony that "he was able to perform his work tasks, all of which involved manual labor in the construction field, without difficulty." Given these findings based on uncontroverted evidence, while Dr. Fluter may have envisioned Gilkey's restrictions to be permanent in 2001, they were, in actuality, not permanent.

On the contrary, Gilkey's restrictions were fleeting because there was no evidence that Gilkey ever worked in a restricted physical capacity during the 12 years preceding

11

the 2014 injury. Of note, the potential for such short-lived work restrictions was acknowledged by Dr. Fluter when he testified in this case that an injured worker may sufficiently recover from a work-related injury to the point where he no longer needs permanent work restrictions. Based on the uncontroverted evidence, that was Gilkey's situation for the 12 years preceding his 2014 injury.

Finally, we are persuaded that our interpretation of the word "permanent" in K.S.A. 2017 Supp. 44-510e(a)(2)(D) is consonant with the general rule that courts must construe statutes to avoid unreasonable or absurd results. *Milano's Inc., v. Kansas Dept. of Labor*, 296 Kan. 497, 501, 293 P.3d 707 (2013). Gilkey's 12 years of full-time employment as a construction worker successfully performing heavy manual labor without any physical limitations clearly established that Dr. Fluter's 2001 work restrictions were not permanent. Had an actual task loss analysis been conducted during the intervening years between 2002 and the current accident, it would have obviously revealed no task loss. Yet, by ignoring the uncontroverted evidence that Gilkey's work restrictions were not, in fact, permanent, and applying a theoretical task loss analysis based on permanent restrictions which Gilkey did not work under, the Board erroneously assessed Gilkey with a zero task loss that significantly reduced his current work disability award. Given a plain reading of the statute, such an interpretation was unreasonable.

Accordingly, we reverse the Board's holding and remand with directions to reconsider the nature and extent of Gilkey's disability award without consideration of any preexisting work restrictions or theoretical task loss attributed to his 2000 work injury.