No. 117,915

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LOREN E. JONES,
*Appellant*,

v.

U.S.D. No. 259,
*Appellee*.

SYLLABUS BY THE COURT

1.

Under the Kansas Judicial Review Act, an appellate court may reverse the Workers Compensation Board's determination if the court finds that the Board erroneously interpreted or applied the law. K.S.A. 2017 Supp. 77-621(c)(4).

2.

An appellate court gives no deference to the Workers Compensation Board's interpretation of statutory language.

3.

The first step of statutory interpretation is to try to determine the legislative intent by looking to the words of the statute, giving common words their ordinary meanings.

4.

When the Legislature used the phrase, "If the employee has preexisting permanent restrictions . . ." in K.S.A. 2013 Supp. 44-510e(a)(2)(D), it created a condition precedent requiring the existence of such permanent restrictions *before* the work tasks the

restrictions address could be excluded from the calculation of the task loss in an award for a subsequent work injury. If there were no such permanent restrictions, then the statute does not apply.

Appeal from Workers Compensation Board. Opinion filed May 4, 2018. Reversed and remanded with directions.

*Jan L. Fisher*, of McCullough, Wareheim & LaBunker, of Topeka, for appellant.

*Travis L. Cook*, *Vincent A. Burnett*, and *Dallas L. Rakestraw*, of McDonald Tinker PA, of Wichita, for appellee.

Before STANDRIDGE, P.J., HILL and BUSER, JJ.

HILL, J.: This is an appeal by an injured worker from the task loss reduction imposed on his workers compensation award by the Workers Compensation Board. While he was working as a middle school janitor for U.S.D. No. 259, Loren E. Jones hurt his cervical spine and upper back while lifting and carrying boxes of copy paper in 2011 and then hurt his lower back while shoveling snow at the school in 2014. He claimed workers compensation benefits for both injuries. The self-insured District contested both of Jones' claims. Since the parties agreed to seek separate awards for both injuries, the Workers Compensation Division docketed the claims separately but then adjudged them in a common proceeding.

The administrative law judge granted Jones his benefits, and the District appealed to the Workers Compensation Board. The Board, again in a combined proceeding, affirmed the ALJ's award for Jones' 2011 upper back injury after finding that his cervical spine injury arose from a workplace accident. The Board, however, reversed part of the award for his 2014 injury after finding that the ALJ's task loss determination failed to account for any task loss attributable to the 2011 injury.

In separate cases, both parties appeal to this court. In this case, Jones, as the appellant, argues that the Board erred in its task loss analysis for the 2014 injury. In the other case—No. 117,970—the District is the appellant and argues that the Board erred in deciding the cause of Jones' 2011 cervical spine injury.

In this opinion, we will focus mainly on the task loss issue raised by Jones concerning the Board's holding on his 2014 injury. We will, however, refer to some of the circumstances of the 2011 injury and its treatment as it relates to the 2014 injury and the computation of task losses. In turn, we will discuss in greater detail the facts of the 2011 injury in our opinion in Case No. 117,970.

*Jones is hurt and seeks medical treatment.*

Jones' first accident occurred on February 14, 2011. On that date, Jones' tasks included moving boxes of copy paper to locations throughout the school, setting up bleachers in the auditorium, and lifting a metal meal cart that had fallen over. The school is a two-story building that does not have an elevator, so Jones was required to carry the copy paper up a flight of stairs. After performing this work, he began to feel pain in his shoulders, arms, hands, and wrists. Jones also claimed to have had numbness and tingling at this time. Jones reported his injury to the District, and the District referred him to Dr. John Babb.

Jones went to see Dr. Babb about ten days later. Jones provided his medical history and described the symptoms he was experiencing. On a pain diagram chart, Jones stated that he was experiencing symptoms in both shoulders, both arms, and his right hand. At this time, Jones was most concerned with his shoulder pain, but stated that his arms, hands, and also wrists had been bothering him.

3

Dr. Babb treated Jones conservatively. He administered a corticosteroid injection into Jones' shoulders and ordered physical therapy. On June 11, 2011, Dr. Babb released Jones to return to work *without restrictions*. Throughout the treatment, Jones denied feeling numbness or tingling in his arms. Although he was released to return to work, Jones was still experiencing some pain in his shoulders and down both arms. Jones also claimed to have been experiencing pain in his neck and shoulders, which extended down both arms into his hands.

For over a year, after he was released to go back to work, Jones returned to his job as a custodian and performed all of the tasks required of him, even though he was experiencing some pain, tingling, and numbness in his hands, arms, and neck. He worked until August 27, 2012, when he went to his primary care physician, Dr. Steven Penner. To Dr. Penner, Jones complained of pain in his neck and problems with his shoulders, arms, and fingers. Jones also complained of having a tingling feeling when he was examined by Dr. Penner. Dr. Penner ordered an MRI exam, which showed spinal canal stenosis and a herniated disc in Jones' cervical spine. Dr. Penner referred Jones to Dr. Raymond Grundmeyer.

Jones told Dr. Grundmeyer that he was experiencing symptoms in his hands, shoulders, back, and neck. Based upon his physical examination and the MRI, Dr. Grundmeyer recommended immediate surgery on Jones' cervical spine. Dr. Grundmeyer performed the surgery on September 12, 2012. Jones had postoperative visits with Dr. Grundmeyer. After Jones had shown sufficient improvement, Dr. Grundmeyer determined it was medically appropriate to allow Jones to return to work *without any permanent restrictions*. Jones returned to work at the school making the same wage he was making before his 2011 injury. Jones continued to work in the same manner as he had prior to this injury.

4

Then, in May 2013, the District had Jones visit with Dr. Chris Fevurly. Dr. Fevurly did not believe that Jones' neck pain was caused by his 2011 injury. In contrast, Dr. Fevurly believed the cervical spine involvement began sometime after the 2011 injury. However, regardless of the causation of Jones' symptoms, Dr. Fevurly opined that Jones should have had permanent work restrictions due to his shoulder injuries. Dr. Fevurly stated that Jones should avoid repetitive or prolonged forceful overhead work.

After that, while shoveling snow on the sidewalks outside of the school in February 2014, Jones was injured at work a second time. He felt pain in his back and legs. He finished shoveling the snow and left for the day. When Jones woke up the following day, he was in severe pain. He informed the District that he was going to a doctor. He went to Dr. Penner, and eventually the District referred Jones to Dr. Larry Wilkinson. Dr. Wilkinson performed a lumbar MRI and referred Jones to Dr. Matthew Henry, a neurosurgeon, for treatment.

To Dr. Henry, Jones complained of pain throughout his back which radiated down his left leg. Dr. Henry diagnosed Jones with lumbar radiculopathy, lower back pain, a herniated lumbar disc at L3-4, bulging discs at L4-5 and L5-S1 causing severe neural foraminal narrowing, and lumbar disc degeneration. Initially, Dr. Henry removed Jones from work and prescribed pain medication and physical therapy. When this treatment did not produce the desired results, Jones underwent lower-back surgery. Following the surgery, Jones was given some work restrictions that were gradually eliminated—ultimately resulting in his release to work without any restrictions.

But, because Jones had been out of work for more than 180 days, the position that he had at the school was no longer available to him. Jones was invited to apply for any open positions. Jones applied for some positions, but he was not hired. Jones did not seek other employment due to his injuries.

*Jones claims workers compensation benefits.*

When Jones filed workers compensation claims for both of his injuries, the parties stipulated to the facts regarding Jones' employment. Further, they stipulated that both of the accidents occurred in the course of Jones' employment. Several doctors provided expert testimony to the ALJ. We offer a brief summary.

Dr. Fevurly was the District's expert. Dr. Fevurly did not believe that Jones had cervical spine involvement when he was being treated by Dr. Babb. Regarding the lower back injury, Dr. Fevurly diagnosed Jones with lumbar degenerative disc disease, with eventual development of bilateral lumbar radiculopathy. In Dr. Fevurly's opinion, the work accident was the prevailing factor in the development of the radiculopathy but not the disc disease. Dr. Fevurly determined Jones had a 10 percent whole body functional impairment. Further, Dr. Fevurly noted that Jones did not have work restrictions following his lower back surgery, and he thought that Jones would be able to accomplish all of his work tasks. But with the limitations due to his shoulder injury, Jones should be limited to medium work.

For his part, Jones presented testimony from Dr. Pedro Murati. Dr. Murati examined Jones' lower back in December 2014. Dr. Murati determined that Jones' symptoms and physical evaluation were consistent with lumbar radiculopathy and Jones' work activities were the prevailing factor in causing the injury. Dr. Murati believed Jones had a 15 percent whole body functional impairment. Dr. Murati set various restrictions upon Jones' activity due to his back injury. According to Dr. Murati, Jones was realistically unemployable due to his lower back injury.

Four months later, Dr. Murati reevaluated Jones. This examination concerned Jones' shoulder and neck pain. Dr. Murati thought that Jones had bilateral carpal tunnel syndrome due to double crush syndrome and either rotator cuff tears or shoulder sprains.

6

He also noted the extent of Jones' neck surgery. Dr. Murati believed that at the very least, Jones' neck and shoulder injuries were an aggravation, acceleration, or intensification of a preexisting condition that was caused by Jones' work activities. Due to this, Dr. Murati determined Jones had a 45 percent whole body functional impairment. With all of this in mind, Dr. Murati would have assigned various permanent restrictions following the 2011 injury. In Dr. Murati's opinion, Jones' suggested work restrictions, a result of his 2011 injury, would have still been applicable at the time Jones was examined for the lower-back injury.

In response to this medical evidence, the ALJ ordered Jones to have an independent medical evaluation performed by Dr. Terrence Pratt. This evaluation involved reviewing medical records in addition to interviewing and physically examining Jones.

Dr. Pratt determined Jones had a 25 percent whole body functional impairment due to his neck injury. Dr. Pratt also assigned a six percent functional impairment to each of Jones' shoulders due to his 2011 injury. Thus, Dr. Pratt ultimately assigned a 31 percent whole body permanent partial impairment, which in his opinion was caused by the 2011 injury. Dr. Pratt believed it was inappropriate for the doctors to have released Jones without permanent restrictions for this injury. Pratt would have, after that 2011 injury, limited Jones by prohibiting him from lifting more than 30 pounds, pushing or pulling more than 40 pounds, and doing overhead activities.

For the 2014 injury, Jones had suffered a 15 percent whole body permanent partial functional impairment that was caused by his work activities. Dr. Pratt stated that Jones should have had some permanent work restrictions due to his injuries. According to Dr. Pratt, following the 2014 injury, Jones should avoid lifting more than 20 pounds and pushing or pulling more than 40 pounds.

7

Based upon task lists produced by two vocational rehabilitation specialists, the doctors also gave task loss opinions. The task loss testimony focused on Jones' 2014 injury. Paul Hardin provided a task list at Jones' request. Steve Benjamin provided a task list at the District's request.

Dr. Murati testified that Jones had lost the ability to perform 83 percent of work tasks that had been identified by Hardin. Dr. Murati did not account for any tasks that Jones would not have been able to complete due to the 2011 injury. Based upon Hardin's task list, Dr. Pratt determined Jones had lost the ability to perform 69 percent of the tasks because of the 2014 injury. This opinion did not include tasks which would have been lost due to the 2011 injury.

Offering a different opinion, when reviewing Benjamin's task list, Dr. Pratt decided that Jones had a 53 percent task loss due to the 2014 injury. However, 15 of the tasks that Jones would not be able to perform could be attributed to the restrictions Dr. Pratt would have placed on Jones for the 2011 injury. Two more tasks may have been prohibited under the restrictions from the 2011 injury, but the wording of the tasks was not clear.

Finally, Dr. Fevurly, using Benjamin's task list, thought that Jones had not lost the ability to perform any of the tasks.

*The ALJ decided the matter, and the Board reviewed the decision.*

For the 2014 injury, the ALJ found the work accident was the cause of Jones' injury. The ALJ was obviously more persuaded by the results of the independent medical exam findings of Dr. Pratt than by the other doctors' evidence. The ALJ adopted Dr. Pratt's determination that the injury resulted in a 15 percent permanent partial impairment of the whole body. The ALJ relied on Dr. Pratt's testimony regarding task loss as it

8

related to Hardin's and Benjamin's task lists to reach a total of 61 percent task loss. The ALJ did not consider any preexisting task loss due to the 2011 injury when making this determination.

The District appealed to the Board. Relevant to this appeal, the District argued the ALJ erred in calculating the task loss for Jones' 2014 injury because it did not include his preexisting permanent restrictions from the 2011 injury.

The Board found that the ALJ did not err in her findings on the causation of the 2011 injury. Without offering further explanation, the Board stated it "agrees with the judge's detailed analysis on these issues." We will delve into this subject in more detail in the companion case.

Despite affirming the ALJ on causation and the extent of Jones' injuries, the Board did find the ALJ's task loss calculation was erroneous. Relying on Dr. Pratt's opinions from Benjamin's task list, the Board found that Jones only lost the ability to perform 11.1 percent of the tasks identified due to the 2014 injury when considering the task loss that occurred due to the 2011 injury. Because of this reduction in task loss, the Board reduced the award that Jones had received.

That brings us to Jones' appeal, where he attacks the Board's order in two ways. First, he claims by operation of either the doctrine of collateral or judicial estoppel the District should be barred from raising the task loss claim to the Board. In his view, the Board erred when it permitted the District to take inconsistent positions where it, in the first claim, stipulated that *Jones had no task loss after the 2011 injury* and then in the second claim argued that Jones' task loss for the 2014 injury must be reduced by the task loss that *should have been imposed* for the 2011 injury.

9

For his second argument, Jones maintains that the Board misinterpreted K.S.A. 2013 Supp. 44-510e(a)(2)(D) to say that retroactive work restrictions from a prior injury can be used to reduce the task loss from a second injury. In other words, where there is medical evidence, as there was here, that indicates there *should have been* work restrictions imposed on a worker from a prior injury, those restrictions will legally reduce the task loss arising from a later injury. We will address the issues in that order.

*We will not consider Jones' estoppel arguments.*

Jones raises his arguments concerning collateral and judicial estoppel for the first time in his brief. Not only were these arguments not raised before the Board, they were not raised in Jones' petition for judicial review. Generally, an issue that is not raised before a lower court cannot be raised for the first time on appeal. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Exceptions to the general rule can be invoked to allow this court to determine issues for the first time on appeal. *State v. Beltz*, 305 Kan. 773, 776, 388 P.3d 93 (2017). Under Supreme Court Rule 6.02(a)(5) (2018 Kan. S. Ct. R. 34), the appellant must present arguments to the court why it should accept one of the exceptions. See *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). Our Supreme Court has warned litigants that they should disregard the rules about raising an issue for the first time on appeal at their own peril. *Godfrey*, 301 Kan. at 1043. Consequently, we will not consider these arguments. We move now to the second issue. Here, we find error.

*The Board ignored a condition precedent in the law.*

Basically, Jones argues the ALJ erred by finding that his task loss for the 2014 injury should have been reduced due to preexisting restrictions from his 2011 injury. Jones takes the position that he did not have any preexisting restrictions that resulted in task loss, because following his treatment for the 2011 injury, he was released to work without restrictions and worked for over a year without limitation.

10

The procedural history of this case dictates our standard of review. Because Jones is appealing a decision of the Workers Compensation Board, our review is under the Kansas Judicial Review Act, K.S.A. 77-601 et seq. Jones is arguing that the Board erroneously applied K.S.A. 2013 Supp. 44-510e(a)(2)(D) when it reduced his award for his 2014 injury for task loss that was attributable to the 2011 injury. Under the KJRA, we may reverse the Board's determination if we find that the Board erroneously interpreted or applied the law. See K.S.A. 2017 Supp. 77-621(c)(4).

This question requires us to interpret and apply the law defining task loss. The interpretation of a statute is a question of law that this court reviews de novo. *Fernandez v. McDonald's*, 296 Kan. 472, 475, 292 P.3d 311 (2013). We give no deference to the Board's interpretation of the statutory language. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010).

As it has been said many times, the primary purpose of statutory interpretation is to give effect to the intent of the Legislature. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). The first step of statutory interpretation is to attempt to determine the legislative intent by looking to the words of the statute, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). Our Supreme Court has instructed:

> "When a workers compensation statute is plain and unambiguous, this court must give effect to its express language rather than determine what the law should or should not be. The court will not speculate on legislative intent and will not read the statute to add something not readily found in it." *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607-08, 214 P.3d 676 (2008).

Turning to the language of the statute at issue, K.S.A. 2013 Supp. 44-510e(a)(2)(D) defines task loss as

11

"the percentage to which the employee, in the opinion of a licensed physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the five-year period preceding the injury. The permanent restrictions imposed by a licensed physician as a result of the work injury shall be used to determine those work tasks which the employee has lost the ability to perform. *If the employee has preexisting permanent restrictions, any work tasks which the employee would have been deemed to have lost the ability to perform, had a task loss analysis been completed prior to the injury at issue, shall be excluded for the purposes of calculating the task loss which is directly attributable to the current injury.*" (Emphasis added.)

The italicized language is especially pertinent here.

The first clause of that last sentence clearly creates a condition precedent. "If the employee has preexisting permanent restrictions . . ." then certain results follow. This is a classic "If . . . then" sentence construction. In the event of certain conditions, then certain legal results follow.

But Jones did not have any preexisting permanent restrictions. The evidence clearly reveals that after the 2011 injury he was released to work by the doctors and he worked *without any restrictions* for over a year. This statute does not apply to Jones' case.

The Board, relying on Dr. Pratt's testimony that there *should have been* permanent restrictions after the 2011 injury, essentially rewrote the statute. In the Board's revision, "if the employee has *or should have had* preexisting permanent restrictions, any work tasks which the employee would have been deemed to have lost the ability to perform, . . . shall be excluded for the purposes of calculating the task loss which is directly attributable to the current injury." This revision would permit task loss reductions for phantom work restrictions that are retroactively created by medical testimony. Obviously, if the Legislature wanted to write the statute in that fashion it could have done so. We must deal with what the text says.

12

We see the evidence in the record that the Board relies upon. Dr. Pratt gave an opinion concerning task loss for Jones' 2014 injury that included an opinion about task loss due to restrictions for the 2011 injury. Based on Benjamin's task list, Dr. Pratt opined that Jones had lost the ability to perform 19 of 36 tasks following his 2014 injury. However, of those tasks which Jones had lost the ability to perform, Jones had already lost the ability to perform at least 15 of them due to the restrictions Dr. Pratt would have imposed for the 2011 injury. Under this erroneous view of K.S.A. 2013 Supp. 44-510e(a)(2)(D), the task loss attributable to the 2011 injury must be excluded when calculating the task loss for the 2014 injury. Thus, the Board incorrectly concluded that Jones had an effective task loss of 11.1 percent when considering only the task loss attributable to the 2014 injury. Because of this misinterpretation we must reverse and remand for a new computation of Jones' task loss.

In struggling with this issue, the Board relied upon a 2016 opinion from this court, *Eder v. Hendrick Toyota*, No. 114,824, 2016 WL 7324454 (Kan. App. 2016) (unpublished opinion). *Eder* is both factually and legally distinguishable from this case.

In a case where the question was primarily whether the Board's finding was supported by substantial evidence, the *Eder* panel considered the testimony of one doctor who stated that a car mechanic had a 56 percent task loss due to two separate injuries, but the task loss was not attributable solely to the second injury, which was the injury being litigated. According to the *Eder* panel, the Board erroneously granted the mechanic a 56 percent task loss, because when it "adjusted" the medical testimony, it ignored the doctor's determination that no task loss was attributable to the second injury. 2016 WL 7324454, at *12. In other words, Eder suffered a task loss from his first injury, not his second. This meant that the Board, when it adjusted the medical testimony, did so without the support of substantial testimony. 2016 WL 7324454, at *12-13. We disagree with any implication in *Eder* that permanent restrictions can be retroactively applied.

13

Basically then, *Eder* teaches us that the focus of K.S.A. 2013 Supp. 44-510e(a)(2)(D) is to have the task loss determination for only the injury that is currently being litigated. In contrast, Jones injured his cervical spine in 2011 and received no permanent restrictions. Thus, the statute, applicable in *Eder*, was inapplicable here.

More recently, in *Gilkey v. Frederick*, 55 Kan. App. 2d ___, ___ P.3d ___ (No. 117,259, filed April 20, 2018, slip op. at 8-12), another panel of this court examined the same statute—K.S.A. 2017 Supp. 44-510e(a)(2)(D)—and rejected the Board's task loss reduction where an injured worker worked without restrictions for 12 years before his new injury. In the *Gilkey* panel's opinion, theoretical work restrictions could not be considered to be preexisting *permanent* restrictions as required by the statute. 55 Kan. App. 2d at ___, slip op. at 11. *Gilkey* is obviously factually different than this case. Although a physician assigned work restrictions because of Gilkey's first work accident, in the following years, Gilkey never worked under any of those restrictions. In contrast to Gilkey, no physician ever assigned Jones any work restrictions based on his 2011 work injury.

Because the Board misinterpreted the statute, we must reverse and remand for further proceedings. We direct the Board to reconsider Jones' award without consideration of any preexisting work restrictions attributed to Jones' 2011 work injury.