NOT DESIGNATED FOR PUBLICATION

No. 118,999

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

THOMAS J. ANDERSON,
*Appellee*,

v.

PAR ELECTRICAL CONTRACTORS, INC., and
OLD REPUBLIC INSURANCE CO.,
*Appellants*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed November 21, 2018. Affirmed.

*John D. Jurcyk*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for appellants.

*Steven A. Ediger*, of Steven A. Ediger, P.A., of Westwood, for appellee.

Before ARNOLD-BURGER, C.J., GREEN, J., and ROBERT J. FREDERICK, District Judge, assigned.

PER CURIAM: Thomas Anderson was electrocuted while working on a job for PAR Electrical Contractors. Anderson filed for workers compensation benefits. The administrative law judge (ALJ) awarded Anderson benefits. On appeal, the Workers Compensation Board affirmed. PAR petitioned for judicial review, arguing that Anderson should be precluded from recovering benefits because he violated its strict safety policy, and PAR did not approve of his actions. For the reasons stated later, we reject PAR's arguments. Accordingly, we affirm.

1

Anderson worked as a journeyman lineman for PAR. On August 18, 2014, Anderson was working on a project for PAR, transferring electrical lines from old utility poles to new utility poles. Anderson and an apprentice went up in a lift bucket to move the overhead lines from the old utility pole to a new one. In order to transfer the lines, Anderson and the apprentice had to move a PVC pipe housing cables from the old pole to the new pole. They needed to shorten the PVC pipe before it could be transferred. To shorten the PVC pipe, Anderson and the apprentice took turns cutting the PVC pipe on their respective ends with a battery-powered rotary saw. While one man was sawing, the other man held onto the cables. The workers believed the cables were dead, meaning they were not carrying an electrical current. According to PAR, the cables could not possibly have been live.

PAR enforces a safety rule referred to as the "five-foot rule." Under the 5-foot rule, an employee who is within 5 feet of an energized source is required to wear protective gear, including rubber gloves and sleeves.

Neither Anderson nor the apprentice wore rubber sleeves or gloves while they were shortening the PVC pipe. Instead, Anderson wore regular leather work gloves as he used the saw. Anderson chose not to wear rubber gloves because he believed he was more than 5 feet from the nearest energized source and because he believed that the bulky rubber gloves would prevent him from operating the saw safely. According to Anderson, the saw had a trigger guard with a small hole where he had to place his finger in order to engage the saw. Anderson claims the hole was too small for him to safely pull his finger out and stop the saw while wearing rubber gloves. Anderson emphasized that this posed an elevated safety risk because he and the apprentice were using the saw at approximately eye level.

While the apprentice was using the saw and Anderson was holding the cables, electricity burnt both of Anderson's arms. An ambulance came to the worksite and took

2

Anderson to the hospital. Anderson spent 10 days in the trauma burn unit and received skin grafts on both arms. His medical bills from the incident totaled over $100,000.

PAR investigated the incident and even attempted to recreate the scene of the accident via photographs. The investigation concluded that several preventable unsafe acts occurred. One of the conclusions was that Anderson violated a safety rule and engaged in an unsafe work practice by failing to use rubber gloves. PAR fired the onsite foreman on the day of the accident. PAR fired Anderson in a letter; the letter said he was fired because he violated a safety rule, but it did not specify which safety rule. The ultimate source of the electricity that shocked Anderson is unknown.

Anderson filed for a hearing before an ALJ in the Division of Workers Compensation, seeking workers compensation from PAR. Anderson argued that he is entitled to workers compensation benefits because he did not violate a safety rule; he also argued he was not within 5 feet of an energized source at the time of the accident. Next, he argued that if he did violate the 5-foot rule, he did not do so willfully or recklessly. Anderson also argued that PAR approved of his decision not to wear rubber gloves at the time of the accident. Finally, Anderson argued that his decision not to wear rubber gloves was reasonable under the totality of the circumstances.

PAR opposed Anderson's request for benefits. First, PAR argued that Anderson should be denied benefits because he willfully failed to use safety equipment the company provided for him. Second, PAR argued that Anderson should be denied benefits because he willfully or recklessly disregarded safety rules. Finally, PAR argued that it did not approve of Anderson's decision not to wear rubber gloves at the time because PAR has a "strict no tolerance policy" for safety violations. All of these arguments hinge on PAR's claim that Anderson was violating the 5-foot rule by being within 5 feet of an electrified source but not wearing rubber gloves at the time he was shocked.

3

The ALJ ruled for Anderson, finding he was eligible for benefits. The ALJ found that "the credible evidence proves" Anderson violated the 5-foot rule and that the violation resulted in his injuries. The ALJ concluded that Anderson was negligent when he violated the rule, but not reckless. Finally, the ALJ also concluded that PAR, through the supervisor on site, approved of Anderson's decision not to wear rubber gloves. Because the ALJ concluded that PAR approved of Anderson's decision not to wear gloves, the ALJ did not reach the question of whether Anderson's actions were willful.

PAR sought review of the decision by the Workers Compensation Board. PAR argued that the ALJ erred because Anderson's violation of the 5-foot rule was either willful or reckless. PAR also argued that "the overwhelming weight of the evidence establishes that the employer did not approve" of Anderson's failure to use rubber gloves.

Anderson did not cross-appeal to the Board, but he responded to PAR's appeal. Anderson argued that there was no substantial evidence that he violated the 5-foot rule. He next argued that even if he did violate the 5-foot rule, he was nonetheless entitled to benefits because PAR approved of his actions. Finally, he argued that if he did violate the 5-foot rule, he did not do so willfully or recklessly.

The Board affirmed the ALJ's award. The Board concluded that Anderson did violate the 5-foot rule, but he did so negligently and not recklessly. The Board also concluded that Anderson was entitled to benefits despite violating the 5-foot rule because PAR approved of his actions. The Board wrote that because it concluded PAR approved of Anderson's actions, it did not need to address whether Anderson's decision to forego rubber gloves was willful or whether it was reasonable under the totality of the circumstances. PAR timely filed for judicial review.

4

*Standard of Review*

PAR raises four issues before this court. First, PAR argues that the Board's finding that PAR approved of Anderson's actions was not supported by substantial evidence. Second, PAR argues that the Board misinterpreted the law when it concluded that PAR approved of Anderson's actions. Third, PAR argues that the Board misinterpreted the law when it concluded that Anderson's violation of the 5-foot rule was not reckless. Fourth, PAR argues that the Board's finding that Anderson was not reckless was not supported by substantial evidence. In his response, Anderson responds to PAR's arguments and raises two additional issues. First, Anderson argues that there was no substantial evidence that he violated the 5-foot rule. Second, Anderson argues that his decision to take off his rubber gloves was reasonable under the circumstances.

In workers compensation proceedings, the burden is first on the claimant to show that he or she has a right to benefits. Once the claimant makes this showing, the burden shifts to the employer to show an exception barring compensation applies. *Messner v. Continental Plastic Containers*, 48 Kan. App. 2d 731, 751, 298 P.3d 371 (2013). Here, the ALJ found that Anderson was entitled to an award because his injury arose from the course of his employment. PAR did not appeal this finding to the Board or this court. The burden is therefore on PAR to show that exceptions to the Workers Compensation Act apply and preclude Anderson from recovering benefits.

The parties here raise issues that fall into two categories of review. Arguments about factual findings are subject to substantial evidence review in light of the record as a whole. K.S.A. 2017 Supp. 77-621(c)(7), (d). While the relevant statute does not define substantial evidence, "case law has long stated that it is such evidence as a reasonable person might accept as being sufficient to support a conclusion." *Kotnour v. City of Overland Park*, 43 Kan. App. 2d 833, 837, 233 P.3d 299 (2010). When reviewing for sufficient evidence, this court must examine

5

"all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact." K.S.A. 2017 Supp. 77-621(d).

This court cannot reweigh evidence or engage in de novo review when reviewing a Board decision for substantial evidence. *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

Arguments about whether the Board misinterpreted or misapplied a statute are subject to de novo review. *Jones v. U.S.D. No. 259*, 55 Kan. App. 2d 567, 575, 419 P.3d 62 (2018). This court does not give deference to the Board's statutory interpretation. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010).

*Was the Board's Finding that PAR Approved of Anderson's Failure to Wear Rubber Gloves Supported by Substantial Evidence?*

Under the Kansas Workers Compensation Act, "[c]ompensation for an injury shall be disallowed if such injury to the employee results from: . . . the employee's willful failure to use a reasonable and proper guard and protection voluntarily furnished the employee by the employer." K.S.A. 2017 Supp. 44-501(a)(1)(C). Such a willful failure does not disqualify an employee from receiving compensation if "it was reasonable under the totality of the circumstances to not use such equipment, or if the employer approved the work engaged in at the time of an accident or injury to be performed without such equipment." K.S.A. 2017 Supp. 44-501(a)(2). Here, both the ALJ and the Board found that Anderson failed to use appropriate safety equipment furnished by PAR. Nevertheless, both the ALJ and the Board concluded that this did not preclude

6

Anderson from receiving benefits because PAR—through its onsite foreman—approved of Anderson's decision not to use rubber gloves.

PAR contends that the record does not contain substantial evidence that PAR approved of Anderson's decision to not wear rubber gloves. PAR combined this argument with its argument that the Board misapplied the law by concluding PAR approved of Anderson's decision not to wear rubber gloves. We note that PAR addressed these points as issue two in its brief. This section of the brief contains only two citations to the record.

"When facts are necessary to an argument, the record must supply those facts and a party relying on those facts must provide an appellate court with a specific citation to the point in the record where the fact can be verified." *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013); see Supreme Court Rule 6.02(a)(4) (2018 Kan. S. Ct. R. 34). This court considers the failure to provide record citations in an argument section a "minor, technical failure" so long as the facts relied on in the argument are accompanied by citations in the statement of facts. See *State v. Allen*, 49 Kan. App. 2d 162, 168, 305 P.3d 702 (2013). Significantly, the relevant standard of review directs this court to consider "all the relevant evidence in the record *cited by any party* that detracts from such finding as well as all of the relevant evidence in the record . . . *cited by any party* that supports such finding." (Emphases added.) K.S.A. 2017 Supp. 77-621(d). In sum, if PAR wanted this court to consider its factual claims in support of its argument that the record lacked substantial evidence that PAR approved of Anderson's decision not to wear gloves, PAR needed to provide citations to the record for those claims, at the very least in its statement of facts.

The first citation in PAR's argument appears when PAR cited to the Board's decision. PAR wrote: "Here, the Appeals Board held that although this employer has a work culture that values and enforces safety procedures, the employee's supervisor was

7

a "bad apple" and *allowed* a safety violation to occur." The second appears where PAR wrote: "There was a foreman on the ground who asked the employee if he thought he should have his gloves on, but employee kept working."

PAR makes a myriad of assertions in its relevant argument section to demonstrate how strongly PAR is committed to safety. For example, PAR sets out assertions of the following: "This employer trains employees daily on safety risks. This employer identifies safety risks and reviews applicable safety policies before every job. This employer held a training session with its employees the day after Employee's accident to reinforce safety rules. This employer provides all protective equipment." Beyond the citation to the Board's decision and the claim that the onsite foreman asked Anderson if he should be wearing gloves as discussed above, none of those assertions were supported by citations to the record.

PAR's Statement of Facts contains the following appropriately cited facts relevant to whether PAR approved of Anderson's actions:

"Employee admitted that he received a safety manual both through the employer and the union."

"Each time a new job is started, a meeting called a tailboard is held to discuss the job, order of operations, and safety hazards. That morning, the group specifically discussed energized conductors, using personal protective equipment, including gloves and sleeves, and using cover, like blankets and insulators called tacos to protect hot wires. After the tailboard ended, each person, including employee, signed the job briefing."

"Amanda Fisher is Human Resources Manager for the employer since March 2013. Ms. Fisher stated the company has a zero tolerance policy for safety violations. . . . Ms. Fisher was not aware of any employees who violated a safety code and were not terminated. From the time she started with the employer to the time of her deposition (approximately 18 months), Ms. Fisher had terminated around 15 people for violation of a safety code."

"Jason Stevens, the general foreman over Mr. Stewart (employee's foreman), testified that employees are always disciplined if they are in the minimum approach distance without rubber gloves. Mr. Stevens was aware of one other situation where a journeyman lineman was fired for not wearing rubber gloves and sleeves."

In his response, Anderson cites his testimony during the regular hearing, as well as deposition testimony from a PAR safety coordinator and a PAR superintendent. The safety coordinator testified that the onsite foreman said he "knew that [Anderson] was not wearing rubber gloves"; and when the foreman was asked why he let Anderson "go up there without rubber gloves," he said that he and Anderson "had been working together" and that he "had full confidence in" Anderson. When asked why he did not stop Anderson from working without rubber gloves, the foreman replied: "[Anderson] was precise and precision with his movements."

Additionally, the record before the ALJ and the Board indicated that PAR fired the onsite foreman as a result of Anderson's accident. From PAR's action of firing the onsite foreman, the ALJ and the Board could have reasonably inferred that PAR lay part of the responsibility for the accident on the onsite foreman, who was responsible for enforcing the safety rules.

PAR's factually supported arguments show that the company has a general commitment to safety, evinced by prejob safety meetings and routine termination of employees for failure to follow safety rules. PAR, however, has not contradicted the deposition testimony from a PAR employee recounting that the onsite foreman was aware of Anderson's failure to use rubber gloves. And nevertheless the onsite foreman chose to let Anderson proceed without gloves because he had faith in Anderson's methods. Accordingly, the record contains substantial evidence to support the Board's finding that PAR, through its onsite foreman, approved of Anderson's failure to use rubber gloves.

9

*Did the Board Misinterpret the Law When It Concluded that PAR Approved Anderson's Failure to Wear Rubber Gloves?*

PAR next argues that the Board erred by misinterpreting the law when it concluded that PAR approved Anderson's choice not to wear rubber gloves. PAR argues that "[h]ere, the Appeals Board held that although this employer has a work culture that values and enforces safety procedures, the employee's supervisor was a 'bad apple' and allowed a safety violation to occur. The Board erroneously applied the law by improperly substituting allow for approve." PAR argues that the Board erroneously did not apply the plain meaning of the word "approve" from K.S.A. 2017 Supp. 44-501(a)(2). According to PAR, "[b]y its plain language, the legislature clearly intended to require that the employer approve of an action, which is a higher bar than allowing an action."

PAR's citation to the Board's conclusion that the onsite foreman was a "bad apple" is incorrect; PAR also misrepresents the Board's conclusion. PAR cited the "bad apple" quote as occurring at volume I, page 132 of the record. Page 132 contains no references to the "bad apple" quote. Rather, the "bad apple" quote appears on page 136. Additionally, the Board wrote, just two sentences before the "bad apple" quote, that "PAR, through the foreman [], approved and allowed Anderson to perform the work without using rubber gloves." The Board did not "substitut[e] [the word] allow for [the word] approve," as PAR maintains. The Board, by its plain language, concluded that PAR, through the onsite foreman both "approved *and* allowed" Anderson's behavior. (Emphasis added.) Anderson cites to the correct "approved and allowed" quote in his argument on this issue in his appellate brief.

PAR cites to one case in support of its argument that the Board misapplied the law by substituting the word "allow" for the word "approve"—*Lira v. Preferred Personnel, Inc.*, No. 1,067,794, 2014 WL 1758045 (Kan. Work. Comp. App. Bd. April 10, 2014).

10

The case involved a worker, Gonzalo Lira, who injured his eye while working without safety glasses. Lira's employer had a strict safety policy requiring workers to wear glasses at all times; Lira was aware of this policy. Lira reported to his supervisors that his glasses were stolen during a lunch break, but the supervisors did not give him more glasses. Lira nonetheless testified that the supervisors "would have given him glasses if the glasses had been available." 2014 WL 1758045, at *4. An employee from the staffing company that employed Lira testified that the staffing company maintained a supply of safety glasses for employees that were kept at the location where Lira worked. The day after his glasses were stolen, Lira returned for another shift and worked without safety glasses because he did not obtain new ones; he was injured during this shift. The Board denied Lira compensation because it found he recklessly disregarded the company safety rule requiring glasses and was therefore barred from recovering under K.S.A. 2013 Supp. 44-501(a)(1)(D). 2014 WL 1758045, at *5-6.

PAR argues that "[l]ike the employee in *Lira* who returned to work before replacing his safety glasses, there must be an element of personal responsibility for an employee who has been repeatedly instructed on safety rules and provided with equipment." Anderson, however, correctly points out that the issue in *Lira* was not whether Lira's supervisors approved of his failure to wear glasses. Rather, the only issues on appeal before the Board were (1) whether Lira recklessly violated a workplace safety rule and, therefore, (2) whether Lira was entitled to workers compensation benefits. Although the Board concluded that Lira was reckless, it did not consider whether his supervisors approved of his actions. 2014 WL 1758045, at *6.

PAR's argument, at its core, is that, for the purposes of K.S.A. 2017 Supp. 44-501(a)(1)(C), PAR did not "approve" Anderson's actions because (1) PAR strongly emphasizes safety and compliance with safety rules and (2) the onsite foreman "asked [Anderson] if he thought he should have his gloves on, but employee kept working." The only case PAR cites, however, is one that does not address supervisor approval.

11

We are unable to locate any authority from this court or from our Supreme Court defining "approve" within the context of K.S.A. 2017 Supp. 44-501(a)(1)(C). While this court need not defer to the statutory interpretation of the Workers Compensation Board, it can be a useful reference. *Vera-Ruiz v. Dupree Landscaping and Lawn Services*, *Inc.*, No. 1,066,283, 2015 WL 4716614 (Kan. Work. Comp. App. Bd. July 29, 2015), is similar to this case. In *Vera-Ruiz*, a landscaper injured his eye when he failed to wear employer-approved safety glasses, but instead wore his own sunglasses. The employer required employees to wear specific shatterproof glasses furnished by the employer, and Vera-Ruiz' supervisor gave him two pairs of safety glasses.

Nevertheless, on the day Vera-Ruiz was injured, his supervisor noticed that he was wearing glasses not provided by the employer. The supervisor asked Vera-Ruiz if the glasses were safety glasses, and Vera-Ruiz said they were; the supervisor did not check the glasses to verify this claim. Because the crew was halfway to a job site when the supervisor realized Vera-Ruiz was wearing improper glasses, the supervisor "allowed claimant to work with his own glasses." 2015 WL 4716614, at *4. Later that day, Vera-Ruiz injured his eye when an object shattered his self-provided glasses and hit his eye.

The business owner testified that the supervisor "would be outside the scope of his employment if he allowed [Vera-Ruiz] to wear other glasses on the day of Vera-Ruiz' accident." The business owner also told Vera-Ruiz' supervisor after the accident that the supervisor "was wrong to allow [Vera-Ruiz] to work without [appropriate] safety glasses." 2015 WL 4716614, at *5. Both the ALJ and the Board in *Vera-Ruiz* concluded that the employer approved Vera-Ruiz' failure to wear appropriate safety glasses. 2015 WL 4716614, at *1, *6.

Here, PAR, as a whole, seems to take a hard-line stance on safety rule enforcement, including enforcement of the 5-foot rule. Nevertheless, given the testimony

12

of the PAR employee—that Anderson's onsite foreman approved Anderson's decision to proceed without gloves—Anderson highlights the following deposition testimony in his brief:

"Q: Did [the onsite foreman] tell you that he knew that [Anderson] was not wearing rubber gloves?

"A: Yes, he did say that.

"Q: Did you ask him why he let Mr. Anderson go up there without rubber gloves, anything to that effect?

"A: Yeah. He said him and [Anderson] had been working together and that he had full confidence in [Anderson].

"Q: Did you understand by that that [Anderson] had operated that way in the past sometime?

"A: I guess you could come to that [conclusion], yes.

. . . .

"Q: Did you ask [the onsite foreman] why he didn't stop it?

"A: Yes.

"Q: And what did he say?

"A: He said [Anderson] was precise and precision with his movements."

While, as in *Vera-Ruiz*, PAR management as a whole did not approve the foreman's choice, the foreman was nonetheless acting in a supervisory capacity representing PAR onsite. From the testimony above, one could reasonably conclude that the foreman did not just passively permit Anderson to work without gloves on one occasion. Rather, one could conclude that the foreman routinely allowed Anderson to work without rubber gloves and developed a rationale for doing so. The Board therefore did not rely on an error of law when it concluded that PAR, via the onsite foreman, approved Anderson's actions in this case.

PAR also argues in its brief that if this court finds that PAR did not approve Anderson's actions, then it should next determine that Anderson's failure to abide by the

13

5-foot rule was "willful." K.S.A. 2017 Supp. 44-501(a)(1)(C) only bars an employee from compensation if the injury was caused by the failure to use protection furnished by the employer if said failure was "willful." As discussed earlier, PAR has failed to show that either (1) the record lacked substantial evidence to support the finding that PAR approved Anderson's actions or (2) the Board misapplied the law when it concluded that PAR approved Anderson's actions. Because substantial evidence supports the Board's conclusion that PAR approved Anderson's nonuse of rubber gloves when this accident occurred, we need not determine whether Anderson's failure to use rubber gloves was "willful."

*Was the Board's Finding that Anderson Was Not Reckless Supported by Substantial Evidence?*

K.S.A. 2017 Supp. 44-501(a)(1)(D) bars an employee from receiving workers compensation benefits if the injury results from "the employee's reckless violation of their employer's workplace safety rules." Here, both the ALJ and the Board concluded that Anderson's actions were not reckless. The Board adopted the ALJ's analysis on the recklessness issue. PAR argues that the record does not provide substantial evidence for the Board's conclusion.

Caselaw defines "substantial evidence" as "such evidence as a reasonable person might accept as being sufficient to support a conclusion." *Kotnour*, 43 Kan. App. 2d at 837. When reviewing for sufficient evidence, this court must examine

> "all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact." K.S.A. 2017 Supp. 77-621(d).

14

The applicable workers compensation statutes do not define recklessness. Accordingly, courts determining whether an employee recklessly violated an employer safety policy for the purposes of K.S.A. 2017 Supp. 44-501(a)(1)(D) look to other areas of law for guidance. This court has looked to the Restatement (Second) of Torts and statutory criminal law for definitions of recklessness for prior workers compensation cases. See *Gould v. Wright Tree Service, Inc.*, No. 114,482, 2016 WL 2811983, at *10 (Kan. App. 2016) (unpublished opinion).

The Restatement (Second) of Torts § 500(a) (1965) recognizes two kinds of reckless conduct. In the first, "the actor knows, or has reason to know . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk." In the second, "the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so."

Under the Kansas Criminal Code, a person acts recklessly "when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2017 Supp. 21-5202(j).

The ALJ properly cited to *Gould's Tree Service*, along with other cases, for the appropriate definition of "reckless." The ALJ found that Anderson's conduct was "negligent, but it does not rise to the level of gross, culpable or wanton negligence constituting recklessness." The ALJ based this decision on the competing testimony in the record. While Anderson testified he removed his rubber gloves because it "allowed him to perform his job of operating the saw easier," Eric Younghans, a PAR

15

superintendent who was not onsite for the accident but who investigated the accident, suggested that Anderson "wanted to minimize the time he wore rubber gloves and sleeves on a hot day." Additionally, the ALJ considered the fact that Anderson's onsite foreman, who was in charge of enforcing safety rules, "allowed [Anderson] to perform his work in violation of [PAR's] safety rules."

Here, PAR argues that Anderson's decision to forego rubber gloves while using the saw near the powerlines was "reckless on its face." PAR states: "It is beyond reason to find that this employee appreciated the risk, violated the rule, admitted an intentional decision, and still was not found to have acted recklessly while exposing himself and his apprentice to a high risk of injury or death." PAR writes without any citation to authority that "[w]here there is an intentional violation that creates an appreciable risk of bodily harm or death—not only to the worker but to the young apprentice in the bucket with him—that action must be reckless."

PAR's claims that Anderson committed an "intentional violation" are inaccurate. While Anderson did testify that he "intentionally" took off his gloves, he never testified that he believed he was within 5 feet of an electrified source when he did so. The applicable safety rule makes it a violation not simply to take off one's rubber gloves, but to do so while within 5 feet of an electrified source. Accordingly, PAR's attempts to characterize Anderson's actions as an "intentional violation" of the safety rule are inaccurate and misleading.

PAR seeks to juxtapose the case at hand with ones where the Board and courts have concluded an employee was not reckless. PAR writes that "[o]ftentimes when the employee's action is not reckless, it is because they do not realize or appreciate the risk." In support of this argument, PAR cites to cases like *Mahathey v. American Cable & Telephone*, No. 1,060,756, 2012 WL 5461478, at *5 (Kan. Work. Comp. App. Bd. October 8, 2012), where PAR explains, the Board concluded that an "employee's action

16

was not reckless when he mistakenly believed the safety measure was in place." As Anderson points out in his brief, *Mahathey* is, in fact, similar to the case at hand because nothing in the record disproves that Anderson had a good-faith belief that he was more than 5 feet from an electrified source.

PAR next, without providing any citations to legal authority or to the record, argues that "[a]s a matter of law, an employee's conduct is reckless when the following occurs:

●  "l. An employee is extensively trained on the employer's safety policy." (Nothing in PAR's statement of facts states that Anderson was "extensively trained," just that he received a safety manual through PAR and his union, and PAR conducted tailboard safety meetings before each job.)

●  "2. The safety rule is an industry standard." (There is nothing in the statement of facts to support this.)

●  "3. An employee has significant experience in his field." (The relevant portion of the statement of facts says Anderson started working as a lineman for PAR in 2009.)

●  "4. An employee is provided with personal protective equipment." (This is not in the statement of facts or PAR's relevant argument section, but in a different argument section.)

●  "5. An employee has personal protective equipment on site and available when the accident occurred." (This is not in the statement of facts or PAR's relevant argument section, but in a different argument section.)

●  "6. An employee testifies it was his decision to not use personal protective equipment." (This is not in the statement of facts or PAR's relevant argument section, but in a different argument section.)

●  "7. Employee voluntarily removes his personal protective equipment in violation of the employer's safety rule." (This is not in the statement of facts or PAR's relevant argument section, but in a different argument section.)

●  "8. Employee works in a profession where there is an increased risk of serious injury or death." (There is nothing in PAR's statement of facts to support this claim; PAR also does not provide a cite to the record for this claim.)

17

● "9. Employee exposed not only himself but another person to high risk or serious injury or death." (There is no citation to the record in PAR's brief that establishes this as a fact. The relevant facts supported by citations are: (1) an apprentice was up in the bucket with Anderson, and (2) the union voted to not allow Anderson to work with apprentices. No record citations establish that Anderson's failure to wear rubber gloves imperiled the apprentice.)

● "10. Employee's ability to train apprentices was revoked by an independent organization due to his failure to follow a mandatory and well-established rule." (The properly cited portion of PAR's statement of facts is as follows: "The Southwestern Line Constructors Joint Apprenticeship and Training Program revoked [Anderson]'s ability to work with apprentices 'based on prior incidents that involved apprentices while under [employee's] supervision.'" This is insufficient to support PAR's claim here.)

● "11. The employer holds tailboards (meetings to discuss safety protocol) before every job." (This is supported in PAR's statement of facts.)

● "12. Employer regularly enforces the safety rule with testimony of Amanda Fisher establishing that 15 employees were terminated for safety violations in about a year and half." (This is supported by appropriate citations in PAR's statement of facts. But terminating 15 employees for safety violations does not weigh on whether Anderson's specific actions in this instance were reckless.)

The only record cite PAR provides in its argument is to testimony from a PAR employee, who stated that while he could not speak for everyone, all the linemen he observed during his 20-year career wore protective gear when they were within 5 feet of an energized source. The employee further testified that "[i]f I was close, within reach or anything, I put them on personally, because I—I don't want to die." As discussed above, PAR's failure to provide citations to the record weighs strongly against its substantial evidence arguments. When reviewing the Board's decision for substantial evidence, we consider

"all the relevant evidence in the record *cited by any party* that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, *cited by any party* that supports such finding, including any

18

determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact." (Emphases added.) K.S.A. 2017 Supp. 77-621(d).

On the other hand, Anderson's brief contains numerous citations to the record in support of his argument that his conduct was not reckless. First, Anderson contends that he did not recklessly violate the 5-foot rule because he did not violate the 5-foot rule at all. Anderson argues that no substantial evidence supports the ALJ's and the Board's findings that he violated the 5-foot rule.

Next, Anderson argues that if he did violate the 5-foot rule, it was not because he was consciously disregarding the risk of electrocution or unconsciously disregarding a risk of electrocution so great that a reasonable man would have acted differently. Rather, Anderson argues he had a "good faith belief" he was more than 5 feet from an energized source. Anderson cites to his testimony that he was aware of the 5-foot rule at all times and that he used rubber gloves and sleeves earlier in the day when he believed he was within 5 feet of an energized source. PAR does not cite to any evidence in the record that contradicts Anderson's testimony that he believed he was not within 5 feet of an energized source.

Anderson points out that even PAR's witnesses admitted that a lineman must rely on his or her "best judgment" to determine whether he or she is within 5 feet of an energized source. Linemen do not use rulers to determine compliance with the 5-foot rule, but they are instead constantly using common sense to make judgment calls. Anderson correctly cites to testimony from a PAR employee deposition in support of this argument. Judgment calls, by their nature, are not precise and can be wrong.

19

PAR does not explicitly argue that Anderson should have known he was within 5 feet. For example, PAR argues in its brief the following:

"Employee appreciated the risk. Employee knew where the nearest energized source was located. Employee was holding wires that were long enough to reach the energized source because they were going to be connected to the new pole location. Based on the physical distance of his body, employee was within five feet of an energized source. Looking at his reach, including the length of the cables he was holding, he was arguably zero feet from the risk. There was potential for contact. Employee was working in an elevated bucket with his apprentice . . . who would have been exposed to the same risks and any errors in employee's judgment. Employee's actions created a risk of harm to others, namely [the apprentice]. There is absolutely a perceptible danger of death or physical harm when a person is working in that close of proximity to a high voltage line without any protective measures. Employee put himself and his apprentice in harm's way. That is more than negligent and simply not failing to take proper care—it is reckless."

This paragraph, like the list discussed earlier, contains no citations to the record. PAR's statement of facts provides no citations to the record regarding the length of the cables. PAR's statement of facts provides no citations to the record indicating that Anderson exposed the apprentice to "the same risks" based on Anderson's failure to wear gloves. PAR's postincident report that was properly before the ALJ concluded that Anderson was within 5 feet of an energized source. Notably, the report was based on estimates, and the authors of the report noted that "[t]he exact location of contact could not be determined." The ALJ and the Board must, however, have agreed that Anderson was, in fact, within 5 feet of an energized source because both ruled that Anderson violated the 5-foot rule.

Because the burden is on PAR to prove that the recklessness exception of K.S.A. 2017 Supp. 44-501(a)(1)(D) applies, we will not consider arguments PAR failed to make. See *Messner*, 48 Kan. App. 2d at 751. PAR failed to argue that there was substantial evidence in the record that Anderson *should have known* he was within 5 feet of an electrified source. This court therefore cannot consider the theory of recklessness where

20

one disregards a risk of which one "should have known." This leaves only the theory of recklessness wherein one disregards a known risk. PAR does not cite to any evidence contradicting Anderson's claim that he did not believe he was within 5 feet of an electrified source when the accident occurred.

This court cannot reweigh evidence when conducting a substantial evidence review. *Williams*, 299 Kan. at 795. Here, the Board adopted the ALJ's recklessness analysis. In the ALJ's decision, the ALJ pointed to evidence including Anderson's testimony that "he thought he was either more than five feet from an energized source, very close to the five-feet limit, or within five feet but by inches." Anderson correctly pointed out on appeal to the Board that Anderson's actual testimony was that he did not believe he was within 5 feet, but if he was, it was by 1/2 inch. When ruling on the recklessness issue, the ALJ also had testimony before it from a PAR employee suggesting he believed Anderson took off the rubber gloves because he did not want to wear them in the heat. This does not contradict or disprove Anderson's claim that he did not believe he was within 5 feet, it merely suggests but does not prove an alternative state of mind at the time of the accident. The ALJ had before it conflicting testimony about Anderson's state of mind, which is relevant to whether Anderson was reckless by disregarding a known risk. Because the ALJ ruled that Anderson was negligent but not reckless, this necessarily required the ALJ to weigh the conflicting evidence. This court cannot reweigh that evidence. Substantial evidence existed in the record to support the ALJ's and the Board's conclusion that Anderson did not recklessly violate the 5-foot rule. Accordingly, PAR's substantial evidence argument fails.

*Did the Board Misinterpret the Law When It Concluded that Anderson Was Not Reckless?*

As discussed previously, K.S.A. 2017 Supp. 44-501(a)(1)(D) bars an employee from receiving workers compensation benefits if the injury results from "reckless

21

violation of their employer's workplace safety rules." Here, both the ALJ and the Board concluded that Anderson's actions were not reckless. The Board adopted the ALJ's analysis on the recklessness issue. PAR argues that the Board misinterpreted the law when it concluded that Anderson was not reckless. In its brief, PAR combined this argument with its previous argument that the Board lacked substantial evidence for its conclusion that Anderson was not reckless. Much of our earlier analysis is therefore useful here as well. This court, however, reviews de novo arguments that the Board committed errors of law.

As described previously, PAR argues that Anderson's conduct was "reckless on its face" and that the Board "erroneously applied the legal definition of recklessness and its conclusion lacked analysis." Further, PAR argues that "[b]ecause there is a finding that the five-foot rule was violated, it is arbitrary and capricious to find that the violation is not reckless."

PAR cites to three Board cases. In the first, *Valenzuela v. Basic Energy Services*, No. 1,065,257, 2013 WL 5521853 (Kan. Work. Comp. App. Bd. September 17, 2013), an employee was injured when he stuck his hand into a running pump engine. The employee claimed the machine was off when he put his hand in and a different employee later turned the pump on. Two other employees, however, testified that the employee put his hand in when he knew the pump was already running. The ALJ and the Board credited the other employees' testimony and concluded the employee was reckless because he put "his hand in moving machinery, a known and obvious danger." 2013 WL 5521853, at *3.

Next, PAR again cites to *Mahathey*. In *Mahathey*, an employee failed to properly hook a ladder to a safety wire and was injured in a fall. The Board concluded that the employee was not reckless because "[i]t was not until after the ladder fell that claimant came to the realization that the hooks were not on the suspension wire." 2012 WL

22

5461478, at *5. The Board concluded that because the employee did not know he was violating the policy, he was not acting recklessly.

Finally, PAR cites *Cox v. Ability Systems, Inc*., No. 1,061,686, 2013 WL 1384403 (Kan. Work. Comp. App. Bd. March 26, 2013). In *Cox*, the Board concluded that an employee was negligent, but not reckless, when he failed to wear a seatbelt. The employee, the Board found, was in the habit of wearing his seatbelt but simply forgot on this occasion; this did not equate to recklessness. 2013 WL 1384403, at *4.

Anderson points out in his brief that these cases show that when an employee makes a good-faith mistake, the employee is still allowed to receive benefits. PAR's argument that Anderson's actions were "reckless on [their] face" relies strongly on its mischaracterization of Anderson's failure to wear gloves as "intentional." As discussed earlier, while Anderson intentionally took off his gloves, he did not believe he was within 5 feet of an energized source when he did so. Also, as discussed previously, the record contains substantial evidence that Anderson believed he was not within 5 feet of an energized source; this evidence is not contradicted or disproved. Thus, Anderson did not "intentionally" or recklessly break the 5-foot rule. This case is more analogous to *Cox* and *Mahathey* than it is to *Valenzuela*.

In sum, we conclude that the Board, by adopting the ALJ's recklessness analysis, correctly applied the law to the evidence before it. As a result, PAR's argument fails by incorrectly defining "reckless."

Anderson argues that the Board's finding that he violated the 5-foot rule was not supported by substantial evidence and, thus, he did not violate a safety rule at all. Anderson also argues that his decision not to wear rubber gloves was reasonable under the totality of the circumstances and, thus, entitles him to benefits under K.S.A. 2017

23

Supp. 44-501(a)(2). Because we have rejected all of PAR's arguments, we need not address these two arguments of Anderson.

Affirmed.